### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION,**
**Plaintiff,**

**CASE NO. 3:21-CV-1051-TKW-HTC**

**v.**

**WALMART INC. and**
**WAL-MART STORES EAST, L.P.,**
     **Defendant.**
_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

COME NOW Defendants, Walmart Inc. and Wal-Mart Stores East, L.P. (collectively "Walmart"), by and through their undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's Local Rules, and file their Motion for Summary Judgment and Supporting Memorandum of Law upon the following grounds:

### INTRODUCTION

Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), alleges in its Amended Complaint that Walmart unlawfully subjected Joelle Saunders ("Saunders") and "a class of female employees" to co-worker sexual harassment by former employee, James Pollock ("Pollock"), when it failed to properly investigate

9534665v1

and take effective action in response to their complaints.[1] Dkt. 59, ¶¶ 15–19, 21–29, and 34. The EEOC claims that Pollock sexually harassed three employees, Saunders, Destiny Riveras ("Riveras"), and Carolina Villalobos ("Villalobos"), Dkt. 84-1 at 5, from July 2018 through November 21, 2018, Dkt. 59, ¶¶ 15-19, 21-29, and 34. The EEOC also alleges that Walmart terminated Saunders in retaliation for complaining about sexual harassment by Pollock. Id., ¶¶ 32–34.

This Court should grant summary judgment in favor of Walmart on the EEOC's harassment claim. None of the aggrieved individuals were subjected to harassment under the law; specifically the conduct about which they complained was not based on sex, and it was not sufficiently severe or pervasive to create a hostile work environment. Furthermore, Walmart cannot be liable for co-worker harassment before it had notice of the behavior. When Walmart received notice of the alleged behavior, it conducted an investigation and took prompt remedial action.

This Court should also grant summary judgment in favor of Walmart on the EEOC's retaliation claim. The EEOC cannot establish a causal connection because the decision maker was unaware of Saunders' complaint at the time she made the decision to terminate her employment for violation of Walmart's attendance policy. The EEOC also cannot present any evidence that this reason is unworthy of belief

---

[1] Notably, the Amended Complaint does not allege that Walmart had a pattern or practice of failing to investigate sexual harassment complaints at its DeFuniak Springs, Florida location.

9534665v1

or not a reason that would motivate a reasonable employer, and that intentional retaliation was the true reason for Saunders' termination.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is warranted when the evidence in the record establishes that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The EEOC must offer more than a "mere scintilla of evidence" to raise an issue of material fact to defeat summary judgment, and "[m]ere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." *Summers v. City of Dothan, Ala.*, 444 Fed. App'x 346, 347 (11th Cir. 2011) (internal citations omitted). Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment, *see Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984); and speculation does not create a genuine issue of fact precluding summary judgment. *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Even taking all the material facts supported by admissible evidence [2] in the light most favorable to the EEOC, this Court should still grant Walmart's Motion for Summary Judgment.

---

[2] For purposes of Defendants' Motion for Summary Judgment only, Defendants accept all the admissible facts Plaintiff alleges as true.

## MEMORANDUM OF LAW AND STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.     At all relevant times, Walmart adhered to its Policies and Procedures**

**A.     Walmart had Policies and Procedures to Prevent Harassment and Retaliation**

Walmart is an equal opportunity employer and adheres to a Discrimination and Harassment Prevention Policy, which strictly prohibits discrimination, harassment, and retaliation, by or directed at any associate[3], job applicant, customer, or member. Dkt. 84-2 at 34:1-14, 354; Dkt. 84-3 at 35:7-16. To assist associates with recognizing, responding to, and reporting harassment, discrimination or retaliation, Walmart also reiterates its prohibition against harassment in its Global Statement of Ethics. Dkt. 84-2 at 30:4-12, 313; Dkt. 84-3 at 33:9-12.

Saunders, Riveras, and Villalobos received training, information, and documentation regarding Walmart's EEO policies, including its Discrimination and Harassment Prevention Policy, and Global Statement of Ethics, through a formal orientation period, on-the-job training, and Computer-Based Learning modules ("CBLs"). Dkt. 84-2 at 22:4-6, 23:4-9, 24:7-25:13, 308; Dkt. 84-3 at 25:15-23, 27:7-30:23, 32:10-18, 35:7-10, 180; Dkt. 84-5 at 30:25-31:6, 46:3-46:16, 53:19-54:4, 55:25-56:11, 247. Riveras testified that associates are trained on the Discrimination

---

[3] Walmart refers to its employees as associates.

and Harassment Policy every couple of months, including how to recognize and report harassment. Dkt. 84-3 at 25:15-23, 35:7-16; Dkt. 84-4 at 1-2, ¶5; Dkt. 84-6 at 95:19-25. Associates also have access to all relevant policies through Walmart's intranet known as "The Wire". Dkt. 84-3 at 33:9-12; Dkt. 84-6 at 94:16-19, 95:3-14, 100:9-10, 101:12-17.

Under Walmart's policy, associates are advised and trained to immediately report any concern regarding possible violations of these policies to any salaried member of Management or confidentially and/or anonymously to the Global Ethics Office by phone, online portal, or by e-mail. Dkt. 84-2 at 30:4-22, 35:5-11; Dkt. 84-3 at 35:17-22; Dkt. 84-5 at 46:17-47:9, 53:19-54:4, 55:25-11. There was also a poster in the Personnel Office that included the Global Ethics Hotline number for associates to use for reporting ethics complaints, including harassment. Dkt. 84-5 at 49:19-50:6; Dkt. 84-6 at 99:7-15.

### B.    Walmart's Attendance and Punctuality Policy in Effect in 2018

Walmart's Attendance and Punctuality Policy required associates to be punctual and present for all scheduled shifts. Dkt. 84-4 at 2, ¶6. Under this Policy, an unauthorized absence from an associate's full shift was considered one occurrence. *Id*. Failing to report an absence was considered three occurrences. *Id*. Reporting to work late or leaving early was considered one half of an occurrence. *Id*. In 2018, associates employed for six months or less were subject to termination

if they accumulated four or more occurrences. *Id*. All hourly associates were subject to this Policy. *Id*. Occurrences automatically populated in the timekeeping system if an associate's activity did not match the schedule. Dkt. 84-6 at 108:9-109:2. Therefore, if an associate's schedule changed, the absence was previously approved, or the absence was protected by policy or law, a salaried member of management was expected to manually adjust the occurrence in the timekeeping software by applying an 'Exception' to the notated absence. Dkt. 84-6 at 104:17-105:8, 107:5-25; Dkt. 84-4 at 2, ¶7.  If an associate was absent for a different reason and felt that absence should be excused, the associate could ask a member of management to grant them an exception so the absence would not count as an occurrence. *Id*. Only salaried members of management can enforce the policy and approve or disprove occurrences in the attendance system. Id., at 2, ¶8. It was in the manager's discretion to excuse an absence based on the circumstances. *Id*. Associates were responsible for keeping track of their attendance occurrence points and could check the number of occurrence points reported on their time records with the computers in the Personnel Office. Dkt. 84-3 at 135:23-136:3, 145:16-20; Dkt. 84-5 at 55:10-14, 220:15-221:24; Dkt. 84-6 at 101:20-102:8.

## II.      Saunders, Riveras, and Villalobos's Employment at Walmart in 2018

### A.      Employment History and Organizational Structure

On April 21, 2018, Saunders began working for Walmart at Store #1134 as a Fresh CAP I[4] Associate in the Meat Department. Dkt. 84-2 at 10:1-22, 41:23-42:2, 43:20-23. On or around September 2, 2018, Riveras transferred from the Deli Department to the Meat Department and began working with Saunders. Dkt. 84-3 at 13:4-7, 41:21-42:1. Pollock worked as a Fresh CAP I Associate in the Meat Department. Villalobos, on the other hand, began working at Store #1134 on July 24, 2018, as a Fresh CAP I Associate in the Frozen Department. Dkt. 84-5 at 30:20-24, 32:18-20, 62:25-63:12. While the Meat Department and the Frozen Department are located near each other, they do not share workspaces. *Id*. at 81:9-12.

During all relevant times, Athena Wright was the Frozen Department Manager and Rob Haubensack was the Meat Department Manager. Dkt. 84-4 at 2-3, ¶¶9-10. As department managers, Wright and Haubensack oversaw the processes and productivity within their departments. *Id*.  Ricky Harrison was the Fresh CAP Supervisor. *Id*. As the Fresh CAP Supervisor, Harrison oversaw the processes and productivity within the Fresh Departments, which included the Meat Department, Deli Department, and Produce Department. *Id*. Neither Wright, Haubensack, or

---

[4]  This position is described in Section II B below and in the Job Description attached at Dkt. 84-2 at 359.

Harrison were salaried members of management, they did not supervise the Fresh CAP I Associates, and while they could coach associates on matters involving productivity, they did not have authority to hire, fire or discipline associates. *Id*.

During all relevant times, Haubensack, Harrison, Riveras, Pollock, and Saunders reported directly to Stephanie Bradley, the Fresh Assistant Store Manager. Dkt. 84-2 at 254:13-19; Dkt. 84-3 at 42:2-13; Dkt. 84-4 at 2-3, ¶9. Wright and Villalobos reported directly to Tammy Newby, the Food Assistant Store Manager. Dkt. 84-4 at 3, ¶10; Dkt. 84-5 at 62:25-63:12. As respective direct supervisors and salaried managers, Bradley and Newby were responsible for monitoring and enforcing Walmart's policies, including the Attendance and Punctuality Policy and Discrimination and Harassment Prevention Policy. Dkt. 84-4 at 1, ¶ 2. During the relevant time period, Chris Wilcox was the Store Manager, William (Gerald) Huckabee was the Asset Protection Manager, and Courtney Huffstutler was the Market Human Resources Manager. Dkt. 84-2 at 23:16-18; Dkt. 84-4 at 3, ¶13; Dkt. 84-4 at 78:1-3.

## B.    Meat Department Fresh CAP I Associate Job Duties and Responsibilities

Saunders and Riveras, as Fresh CAP I Associates in the Meat Department, only worked on the sales floor, in the meat prep room (i.e., "cooler"[5]), and in the

---

[5] Throughout her deposition, Riveras referred to the meat prep room as a "cooler." Dkt. 84-3 at 49:7-13.

meat freezer. Dkt. 84-3 at 50:21:23. The meat freezer is a rectangular room with floor to ceiling shelves for storing raw meat waiting to be rotated to the sales floor. Dkt. 84-2 at 125:11-25. The meat prep room is smaller than the meat freezer and included 2-3 tables, a sink, a scale, trash cans, and 5-6 wheeled racks used to transport the meat from the prep room to the sales floor. Dkt. 84-3 at 50:2-20. Because of the supplies and limited space, both rooms were crowded and often difficult to maneuver within when more than one associate was in that workspace. Dkt. 84-2 at 125:7-10, 126:1-17; Dkt. 84-3 at 50:17-20. For instance, on truck delivery days, three to four associates would be scheduled from the Meat Department to assist with unloading the trucks. Dkt. 84-2 at 106:21-107:3. When each of the pallets of fresh meat were stacked in the center of the meat freezer, only approximately 2-4 feet of workspace would be left between the shelves and the pallets. Dkt. 84-2 at 106:21-25, 126:1-17; Dkt. 84-3 at 48:19-49:6.

## III.   Alleged Inappropriate Comments and Behavior by James Pollock

### A.   Alleged Inappropriate Behavior by Pollock from the End of July 2018 to Sometime in August 2018

During the end of June and beginning of July 2018, Saunders noticed her coworker, Pollock, staring at her while she worked. Dkt. 84-2 at 256:18-20. Saunders testified that, approximately a month later, during the end of July and beginning of August 2018, Pollock began touching her on her hips or back when he

9534665v1

maneuvered around her during truck delivery days and made inappropriate comments about her body. *Id*. at 144:17-21, 258:5-12, 264:17-4.

Sometime in August 2018, Saunders complained to Harrison, for the first time, that she was becoming "increasingly uncomfortable around [Pollock] because he was making inappropriate comments and invading [her] personal space". *Id*. at 108:14-15, 109:6-10, 144:22-25. Saunders testified that during that initial conversation, she told Harrison that Pollock had engaged in the following behavior:

- Touched her hips or placed his hand on her upper or lower back when he needed to pass her during truck delivery days.
- While standing in the meat prep room, leaned over and whispered to her once, "You shouldn't move your arms around like that because your boobs move with them."
- Between 5 and 10 times, commented that she would "ruin her boobs", "squish her boobs" or "mush her boobs" if she leaned against the ladders too much.
- One time, said, "I bet you are about a C cup."
- One time, said, "If you lift heavier things, your cup size would go up."
- Once, asked her if her cup size had gone up.
- Once, after exiting the freezer, opened her jacket and looked at her chest and said, "Well, obviously you weren't in there long enough."

*Id*. at 110:18-111:18, 115:9-116:6, 116:12-19, 117:5-10, 119:25-120:10, 121:1-13, 123:1-124:25, 125:7-25, 126:1-17, 130:22-131:3, 138:20-139:2, 168:1-17. Saunders testified that no one else was around or heard Pollock say these inappropriate comments to her. *Id*. at 115:16-17, 116:18-19, 118:3-5, 120:17-19, 121:11-13, 123:6-8, 168:5-6.

Saunders also alleged Pollock made two other statements she did not tell Harrison about: "I'm a breast man. I like nice mountains with pointy snow caps. *Id*. at 168:23-169:8, 169:11-16, 170:1-3, 368. You fit the description," and once referred to breasts as "all day suckers" to her. *Id*. During her deposition, Saunders confirmed that these comments were made when they were alone. *Id*. She also explained that these comments were made before she complained to Harrison about Pollock's behavior, even though she did not mention them to Harrison at that time. *Id*.

According to Saunders, Harrison wanted to immediately report her concerns to a salaried manager, but she did not want to escalate her concerns. *Id*. at 109:14-23. Instead, Saunders asked Harrison if she could be transferred to a different department to create physical distance between herself and Pollock while on shift. *Id*. at 108:2-8. Responding to Saunders' concerns, Harrison agreed to assign Saunders to another department on non-delivery days, limiting her interaction with Pollock to only one or two days a week during truck delivery when she would assist in the Meat Department. *Id*. at 107:14-108:1, 111:25-112:6, 112:10-20, 113:2-6. She remained in the other department for the remainder of her employment. *Id*. at 150:15-20.

**B.    Alleged Inappropriate Behavior by Pollock Between September 2018 and October 1, 2018**

On September 2, 2018, Riveras transferred from the Deli Department to the Meat Department. Dkt. 84-3 at 13:4-7, 20:11-19, 41:21-42:1, 176, 244. From

11

September 2, 2018, through October 1, 2018, Pollock, Riveras, and Saunders worked

a total of six shifts at the same time, while Saunders still worked in the other

department on non-delivery days. Dkt. 84-2 at 150:15-20; Dkt. 84-4 at 3, ¶11. During

those six shifts, Riveras testified she witnessed Pollock:

- Grab Saunders' waist or brush up against her while trying to get by her. Dkt. 84-3 at 61:4-15, 62:3-12, 63:6-8;
- Once compare Saunders' breasts to chicken breasts. *Id*. at 69:11-70:14; and,
- Look towards Saunders and Riveras' direction and smile. *Id*. at 90:9-16, 91:19-20, 93:7-10.

Other than the chicken breast comment, Riveras did not hear Pollock say anything

inappropriate to Saunders. *Id*. at 71:3-5. Riveras also testified that after she had been

working in the Meat Department for approximately 2-3 weeks, Pollock placed his

hand on her waist or brushed up against her a few times when he walked by her on

the sales floor. *Id*. at 76:9-77:5. She also testified that Pollock was watching her bend

over an end cap while she stocked merchandise, then laughed and said he would

need to be "extra nice to his wife that night." *Id*. at 76:9-77:8, 89:3-21, 109:18-23.

In mid-September 2018, after Saunders climbed down from a ladder in the

meat freezer, Pollock slapped Saunders on the butt. Dkt. 84-2 at 130:8-12, 133:2-7,

134:15-16; Dkt. 84-3 at 70:15-71:5. According to Saunders, she complained to

Harrison about the behavior and asked him to escalate her concerns. Dkt. 84-2 at

145:10-15. Saunders also testified that before she complained to Harrison the second

time, Pollock, when there were no witnesses around, made the following four

inappropriate comments[6] to her:

- Asked Saunders again if her bra cup size had increased;
- Continued to make comments to her about squishing her boobs if she leaned on the ladder too much;
- Said she "could fill out a pair of jeans;" and,
- Joked that a butterflied pork chop looked like a vagina, then whispered to Saunders, "I bet yours looks like that."

*Id*. at 117:11-20, 118:3-5, 118:14-16, 119:18-21, 121:1-13, 124:5-11, 130:13-18,

131:20-132:4, 134:9-14, 134:17-135:2, 135:17-22. After Saunders complained to

Harrison in September 2018, she remained exclusively in the other department and

only assisted with truck delivery days one day a week. *Id*. at 149:1-4, 150:9-20. She

testified that after she complained to Harrison in September 2018, Pollock never

touched her other than brushing past her or standing close to her if they worked a

truck. *Id*. at 146:13-25.

### C. Saunders and Riveras Report the Alleged Inappropriate Behavior by Pollock to Salaried Management in Late September 2018

Within three days of Saunders complaining to Harrison, on Wednesday,

September 19, 2018[7], Harrison reported Saunders' complaint to Bradley, who

---

[6] Even though it is unclear whether Saunders informed Harrison about the four comments, it is undisputed that all of these comments were made before Saunders complained to Harrison in September 2018. Dkt. 84-2 at 124:5-11, 131:20-132:4, 134:9-14, 135:17-22.

[7] Saunders could not recall during her deposition when she complained to Harrison the second time. *Id*. at 145:16-18, 146:7:12, 226:21-227:1. Riveras testified she witnessed Pollock slap Saunders' butt, which prompted Saunders to complain a

informed him that she would address the complaint. *Id.* at 147:14-24, 148:22-25.

The next day, Thursday, September 20, 2018, both Saunders and Bradley were off

work. *Id.* at 87:21-23, 145:2-5, 149:5-15; Dkt. 84-4 at 3, ¶12. However, that day

Saunders went into the store to shop, at which point Harrison informed her that he

had spoken with the manager on duty, William (Gerald) Huckabee, Asset Protection

Manager, about her concerns and suggested they both speak with him. Dkt. 84-2 at

145:2-5, 149:5-15. Huckabee, Saunders, and Riveras met to discuss Saunders'

concerns.[8] Dkt. 84-2 at 149:5-15; Dkt. 84-3 at 58:2-20. According to Riveras, during

this meeting, she and Saunders told Huckabee that Pollock made inappropriate

comments to them and inappropriately touched them. Dkt. 84-3 at 58:2-20, 105:18-

106:22. Riveras also testified that they did not provide Huckabee with all the facts,

but, instead, only provided enough information to get guidance on next steps. *Id*. at

58:2-20, 105:18-106:22, 107:21-108:12, 109:12-23. For instance, they informed

Huckabee that Pollock would brush up on them, slapped Saunders on the butt, and

---

second time to Harrison. Dkt. 84-3 at 70:15-71:5. However, other witnesses testified
that Harrison reported the incident to Bradley on September 19, 2018, and that
Saunders had complained to him earlier that day about the inappropriate behavior
from Pollock. Dkt. 84-4 at 3, ¶12.

[8] Riveras testified that she was with Saunders the first time Saunders reported the
concerns to Huckabee. Dkt. 84-3 at 58:2-20. Saunders, on the other hand, testified
Harrison and Teresa Masters, Personnel Coordinator, were in the meeting. Dkt. 84-
2 at 87:7-10, 145:23-25, 146:1-3. Regardless, it is undisputed Huckabee was made
aware in late September 2018 that Saunders felt Pollock was being inappropriate
and, taking the facts in the light most favorable to the Plaintiff, Huckabee was made
aware Riveras had concerns about Pollock's behavior in late September 2018.

made a comment to Riveras about being extra nice to his wife when he got home. *Id*. at 109:18-23.

Once they briefly explained the situation to him, Huckabee asked them to write a statement detailing what they remembered, including when it occurred, what occurred, and where it occurred, and to turn it in as soon as possible so he could move forward with the investigation. *Id*. at 105:18-106:22, 111:4-20. Huckabee also assured them that they would not be terminated for complaining or participating in the investigation. *Id*. at 105:18-106:22.

On Friday, September 21, 2018, Bradley learned that Huckabee had also been made aware of Saunders' concerns. Dkt. 84-2 at 156:15-24; Dkt. 84-4 at 3, ¶13. Huckabee also informed Bradley that he had already asked Saunders to write a statement. Dkt. 84-4 at 3, ¶13. Consequently, because Saunders had already spoken with Huckabee, Bradley did not discuss Saunders' concerns with Saunders directly. *Id*. On Monday, September 24, 2018, when Wilcox returned from vacation, Bradley and Huckabee informed Wilcox that Saunders had made a complaint and that they were waiting on Saunders to provide a written statement. *Id*. at 3-4, ¶14. At this point, Bradley was not aware that Riveras was a witness or that Riveras had raised any concerns about Pollock's behavior. *Id*.

About a week after Saunders met with Huckabee, Harrison told Saunders that Huckabee asked whether she had returned the statement. Dkt. 84-2 at 161:25-16,

162:17-21. When Saunders went to speak with Huckabee to explain why she had not yet provided a written statement, Huckabee informed her that the Market Human Resources Manager, Courtney Huffstutler, was visiting the store on a routine visit and Huckabee suggested they both speak with her. *Id*. at 161:18-24.

Both Huckabee and Huffstutler sat down with Saunders to listen to her concerns. *Id*. at 163:3-165:24; Dkt. 84-8 at 159:5-20, 161-8-24. During that meeting, however, Huffstutler felt that Saunders was non-committal and non-specific with her complaint, including being hesitant to move forward with the investigation at all. Dkt. 84-2 at 163:3-165:24; Dkt. 84-7 at 1, ¶5; Dkt. 84-8 at 161:8-24, 162:25-163:11. Huffstutler told Saunders that even if she refused to turn in a statement, Huffstutler was going to move forward with investigating her concerns. Dkt. 84-2 at 163:25-164:5. Huffstutler encouraged Saunders to complete the written statement and turn it in. Dkt. 84-8 at 166:21-167:2. During that meeting, Saunders told Huffstutler that she would probably be "gone soon anyway" because of her attendance issues. Dkt. 84-7 at 1-2, ¶5.  Huffstutler told her that her attendance was a separate issue, and that Walmart would investigate her complaint regardless of her attendance issues. *Id*. Additionally, during the meeting, both Huckabee and Huffstutler reminded Saunders that Walmart had a non-retaliation policy, and she would not be terminated for complaining about Pollock. *Id*.

9534665v1

**IV.  Saunders' Termination for Violating Walmart's Attendance and Punctuality Policy**

As early as June 2018, Saunders began accruing occurrences for her absences. Dkt. 84-4 at 4, ¶15. Sometime in July or August 2018, after Saunders accumulated six occurrences, Bradley and Harrison spoke with her and suggested she contact Sedgwick for a medical accommodation. Id.; Dkt. 84-2 at 63:13-66:1. Assistant Managers have discretion in making termination decisions under the Attendance and Punctuality Policy if there are extenuating circumstances. Dkt. 84-4 at 2, ¶8. Thus, despite being eligible for separation as early as July 12, 2018, Bradley did not terminate Saunders in an effort to give her time to work with Sedgwick. *Id*. at 4, ¶15. Saunders, however, never contacted Sedgwick. Dkt. 84-2, at 63:13-15. Instead, Saunders continued to accumulate unauthorized absences. *Id*. at 69:19-25. Prior to complaining about Pollock's behavior to either Harrison or Huckabee, Saunders was aware she was in violation of the attendance policy and was aware that given the number of occurrences she had, she could be terminated. *Id*. at 69:19-25, 88:13-22. During her employment, she never asked for an exception for any of the occurrences she had, and she did not escalate any of the occurrences for management review. *Id*. at 101:23-102:6.

On September 19, 2018, Saunders had an unauthorized lateness, which brought her to 7.5 occurrences under Walmart's policy.  Dkt. 84-4 at 4, ¶16. When Saunders was late on September 19, 2018, Bradley was immediately notified via

9534665v1

email.  *Id*. Upon receiving this email, Bradley made the decision to terminate Saunders' employment.  *Id*. She had previously told Saunders she needed to contact Sedgwick to have some of her occurrences excused, and not only had Saunders failed to do so, but she had now incurred an additional attendance occurrence.  *Id*.

Before Bradley could implement the termination, she was notified for the first time that Saunders had raised a complaint against Pollock. *Id*. Knowing Walmart prohibited retaliation, Bradley decided she needed to speak with human resources to see if she could still move forward with the termination decision.  *Id*. at 4, ¶17. Bradley thereafter spoke with Huffstutler and was advised that a complaint did not excuse violations of the attendance policy and that she could move forward with termination. *Id*.  Huffstutler explained to Bradley that she should consistently apply Walmart's policies to Saunders, regardless of any ethics complaints that may be pending. Dkt. 84-6 at 71:8-15**.**

On Monday, October 1, 2018, store management ran its weekly attendance report, which included Saunders' 7.5 occurrences. *Id*. at 4-5, ¶18. Having already spoken to Huffstutler, Bradley asked Newby to communicate the termination decision to Saunders. *Id*. As part of the termination paperwork, Bradley ran a report specific to new hires who had more than four attendance points and printed out the list of occurrences Saunders had committed. *Id*. At the end of her shift on October 1, 2018, Newby met with Saunders and informed her that she was terminated

effective October 1, 2018, for Excessive Absences/Tardiness. Dkt. 84-2 at 70:1-13, 71:1-5, 44:10-12. No one at Walmart told Saunders she was being terminated in retaliation for bringing a complaint against Pollock. Dkt. 84-2 at 86:14-17. After the termination meeting, Saunders turned in the written statement to Huckabee. Dkt. 84-2 at 73:6-10, 75:4-8.

Saunders then met with both Bradley and Huckabee to discuss her termination. Dkt. 84-2 at 77:2-15. During the meeting with Bradley and Huckabee, Bradley explained to Saunders that she was terminated for attendance because she did not call Sedgwick to receive a medical accommodation for her occurrences. Dkt. 84-2  at 77:2-15. Saunders asked Bradley if her occurrences could be erased since she complained of harassment, which Bradley informed her that they could not. Dkt. 84-4 at 5,  ¶19. Bradley also followed up with Saunders regarding her complaint and that they were still waiting on the written statement, which Saunders replied she just turned it into Huckabee.[9] Dkt. 84-2 at 77:17-25; Dkt. 84-4 at 5, ¶19. Before the meeting ended, Bradley informed Saunders that in December she would be eligible for rehire and that Bradley would rehire her once she became eligible. Dkt. 84-2 at 77:16-25.

---

[9] Saunders did not interpret this statement to mean that Bradley was terminating her for not providing a written statement. Dkt. 84-2 at 103:14-23.

## V.      Walmart  Investigates  Pollock's Conduct

### A.      Walmart Investigates  Saunders' and Riveras' Complaint

#### 1.      *Initial Investigative Steps*

After Saunders was terminated on October 1, 2018,  she turned in a written statement to Huckabee complaining that Pollock made inappropriate comments to her about her body, slapped her butt, and touched her on her back or hips as he tried to maneuver around her and the pallets on truck delivery days. Dkt. 84-2 at 166:18-20, 368.

After Saunders turned in her written statement, on October 1, 2018, Huckabee reminded Riveras that he still did not have her written statement. Dkt. 84-3 at 112:6-10, 112:23-113:1. Because Saunders had been terminated, Riveras refused to give Huckabee a statement or participate any further in the investigation. Dkt. 84-3 at 112:6-10, 112:23-113:1. Huckabee asked her at least once a day for the written statement until she finally turned it in on November 12, 2018. Dkt. 84-3 at 59:1-60:9, 113:18-22, 247. Riveras testified that Pollock did not act inappropriately towards her after she complained to Huckabee on September 20, 2018. Dkt. 84-3 at 94:17-22, 120:5-7.

Huffstutler was also made aware of the specific contents of Saunders' statement and, with that information, on October 1, 2018, she submitted an ethics report via Walmart's Global Ethics Hotline, reporting that Saunders alleged a co-

9534665v1

worker sexually harassed her by making comments about her body and touching her rear end and hips. Dkt. 84-8 at 173:2-23, 322. Huffstutler also reported that Saunders complained Pollock made sexual comments to both Saunders and Riveras. *Id*. The case was officially assigned case number WM-18-10-00277 by Global Ethics and assigned to Wilcox for investigation on October 3, 2018. Dkt. 84-8 at 171:3-8, 322.

Prior to Global Ethics assigning the case to Wilcox for investigation, however, Huffstutler asked Wilcox to move forward with gathering statements from Harrison and Bradley, and to interview Pollock. Dkt. 84-2 at 23:16-18; Dkt. 84-8 at 176:8-15, 183:21-24, 322, 329. On October 2, 2018, prior to going on vacation, Bradley submitted a written statement to Wilcox, which Wilcox forwarded to Huffstutler. Dkt. 84-8 at 181:23-182:11; Dkt. 84-6 at 137:3-18, 236.

Besides identifying Riveras as a potential witness, Saunders never disclosed any other witnesses and, during her deposition, maintained there were no witnesses to the inappropriate behavior. Dkt. 84-2 at 115:16-17, 116:18-19, 118:3-5, 120:17-19, 121:11-13, 123:6-8, 132:5-10, 168:5-6. Huckabee spoke to Riveras, the only alleged witness, on both September 20, 2018 and October 1, 2018, and, according to Riveras, asked her to write a statement every day until November 12, 2018. Dkt. 84-3 at 58:2-20, 59:1-60:9, 112:6-10, 112:23-113:1, 113:18-22, 247. Bradley also spoke to Riveras shortly after October 1, 2018, assuring Riveras that Saunders was

terminated for attendance and not because Saunders complained about Pollock. Dkt. 84-3 at 106:15-22.

### 2. *A Catastrophic Category 5 Hurricane Delayed Completing the Investigation*

Within a few days of Saunders' termination, store management was alerted to a hurricane in the Gulf of Mexico with a predicted landfall somewhere in the Florida Panhandle where DeFuniak Springs is located. Dkt. 84-8 at 178:15-19; Dkt. 84-4 at 5, ¶20. Store #1134 began stocking emergency supplies and merchandise to serve the community, and subsequently experienced an increase in sales and traffic as the community prepared for landfall and the unpredictable aftermath of the storm. Dkt. 84-4 at 5, ¶20. Management was responsible for preparing the facility and executing emergency standard operating procedures in the event the hurricane hit DeFuniak Springs. *Id*. In addition to preparing Store #1134 for a hurricane, Huckabee, as the Asset Protection Manager, also spent the week leading up to the hurricane assisting stores within the projected path of the hurricane. *Id*. Similarly, multiple stores within Huffstutler's market and within her scope of responsibilities as the Market Human Resources Manager were within the projected trajectory of the storm. Dkt. 84-7 at 2, ¶7. Huffstutler worked closely with store management throughout her market to prepare for landfall. *Id.*

On October 10, 2018, Hurricane Michael made landfall as a Category 5 Hurricane, with the extreme winds and storm surge causing catastrophic damage to

9534665v1

Panama City and Mexico Beach. Dkt. 84-4 at 6, ¶21. For at least two weeks after landfall, Huckabee spent the majority of his time assisting the Asset Protection Managers in Bay County as they assessed damage and implemented emergency response protocols. *Id*. Similarly, Huffstutler also remained in Bay County to assist with locating associates, implementing disaster relief efforts, and making sure associate physical and mental needs were being met.  Dkt. 84-7 at 2, ¶7; Dkt. 84-8 at 178:15-181:12. In an additional effort to assist with getting the five Panama City stores back up and running, Store Managers from the surrounding area, including Wilcox, were pulled from their home stores to assist with disaster relief efforts. Dkt. 84-8 at 178:15-181:12.

As a result of the hurricane, Store #1134 temporarily lost electrical power, which meant all consumable food products needed to be thrown away and restocked. Dkt. 84-4 at 6, ¶22. Additionally, because of Hurricane Michael, normal truck deliveries were delayed and trucks that had been en route to Bay County were diverted to surrounding stores, including Store #1134. *Id*. Consequently, both management and hourly associates worked overtime to address community needs, rotate product, and keep emergency supplies and merchandise available for the community. *Id*.  For the next few weeks, Wilcox, Bradley, Huckabee, Huffstutler, and other members of management at Store #1134 were consumed with responding to the devastation caused by Hurricane Michael. *Id.;* Dkt. 84-8 at 178:15-181:12.

Before Wilcox could conclude his investigation into Saunders' complaint, on November 1, 2018, Villalobos complained to Huckabee that Pollock touched her inappropriately, prompting a second investigation. Dkt. 84-5 at 91:3-5, 92:20-93:5, 246.

**B.      Villalobos' November 2, 2018 Allegation of Inappropriate Behavior**

On October 30, 2018, Villalobos was stocking the freezer on the sales floor when Pollock walked up beside her, placed his arm around her waist, and while standing shoulder to shoulder, began talking to her. Dkt. 84-5 at 89:9-11, 91:3-5, 92:20-93:5, 96:12-15, 97:7-20, 98:5-99:2, 246. Within a few seconds of Pollock approaching her, Villalobos moved his arm from around her, and turned to face him while they spoke. Dkt. 84-5 at 99:3-100:10. Once they faced each other, Pollock was no longer touching Villalobos. Dkt. 84-5 at 100:4-101:21, 103:20-22. For about five minutes, Pollock spoke to Villalobos about what he ate the night before. Dkt. 84-5 at 101:2-102:18. Villalobos formally complained about Pollock's behavior on November 1, 2018, and submitted a written statement to Huckabee. Dkt. 84-5 at 90:4-7, 93:14-17, 246.

**C.      Walmart's Continued Investigation of Saunders' and Riveras' Allegations, and Investigation of Villalobos' Allegation**

On Friday, November 2, 2018, even though Villalobos worked in the Frozen Department and Pollock worked in the Meat Department, Villalobos asked Harrison to change work areas. Dkt. 84-5 at 110:4-11, 113:1-14, 246, 302. At Villalobos'

24

request, Harrison assigned Villalobos to the cleaning supplies area within the grocery section. Dkt. 84-5 at 113:1-14, 241, 302. About an hour later, Pollock approached Villalobos and asked her if she had been moved out of Frozen, to which she responded, "no." Dkt. 84-5 at 115:10-116:12, 241, 302. Pollock then left. *Id*. At no time during Villalobos' shift did Pollock touch her or say anything inappropriate to her. Dkt. 84-5 at 115:10-116:12, 119:13-18, 241, 302. In fact, other than the October 30, 2018 interaction with Pollock, Villalobos testified Pollock was never inappropriate towards her.  Dkt. 84-5 at 141:21-144:14.

On November 9, 2018, Wilcox, Huckabee, Michael Reese (Market Asset Protection Manager), and Villalobos met to discuss Villalobos' complaint against Pollock. Dkt. 84-5 at 156:24-157:8, 157:20-22, 241, 302. Because of the ongoing investigation into the concerns raised by Saunders, at the end of the meeting, management confirmed that there was already an open ongoing investigation against Pollock. Dkt. 84-5 at 156:9-14, 241, 302. After this meeting, on November 10, 2018, Wilcox formally interviewed Pollock regarding the  complaints of his inappropriate behavior. Dkt. 84-7 at 2, ¶8. Pollock denied that he behaved inappropriately, at the conclusion of the interview. *Id*. Wilcox suspended Pollock pending the results of the investigation. *Id*. On November 10, 2018, Wilcox informed Villalobos that Pollock had been suspended. Dkt. 84-5 at 158:22-159:1; Dkt. 84-6 at 140:20-25.

On Monday, November 12, 2018, Wilcox and Huckabee followed-up with Villalobos and asked if she was aware of any witnesses to Pollock's behavior. Dkt. 84-5 at 159:19-160:13. Villalobos identified Saunders and Riveras as other witnesses. *Id*. Upon learning this information, Wilcox obtained a written statement from Riveras and another employee, Haubensack, and informed Villalobos that Pollock would not be returning to work. Dkt. 84-7 at 3, ¶9. On November 15, 2018, Walmart concluded its investigation and Wilcox and Huffstutler met with Villalobos and informed her that Pollock was terminated. Dkt. 84-5 at 164:14-19; Dkt. 84-7 at 3, ¶9. Due to scheduling issues and the intervening weekend, Bradley communicated the termination decision to Pollock on November 21, 2018. Dkt. 84-6 at 137:19-138:6; Dkt. 84-4 at 6, ¶ 23.

## **LEGAL ANALYSIS**

### I.    **The EEOC's Sexual Harassment Claims Fails as a Matter of Law.**

To establish a claim of hostile work environment based on sexual harassment, the EEOC must show that Saunders, Riveras, and Villalobos: (1) belong to a protected group; (2) that they have been subject to unwelcome sexual harassment; (3) that the harassment was based on their sex; (4) that the harassment "was sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatorily abusive working environment;" and (5) a basis for holding Walmart liable. *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th

9534665v1

Cir.1999). The EEOC cannot satisfy the *prima facie* requirements because it cannot establish that the conduct was based on sex or that each of these women experienced severe or pervasive conduct rising to the level of harassment. Moreover, assuming they were subjected to sexual harassment, which they were not, the EEOC cannot establish a basis to hold Walmart liable. Indeed, the undisputed evidence demonstrates that Walmart took appropriate and prompt remedial action in response to each complaint.

### A.   Most of the alleged conduct and comments were not based on sex

Offending words and conduct are not based on sex unless they are used in a gender-derogatory manner. *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 838 (11th Cir. 2021) (finding that teasing plaintiff about her vagina and vaginas, generally, is not gender-derogatory and therefore, cannot be actionable under Title VII). Conduct "merely tinged with offensive sexual connotations" is not sufficient to show discrimination because of sex. *McMillan v. Postmaster General*, 634 Fed. Appx 274, 276 (11th Cir. 2015); *see also Howard v. City of Robertsdale,* 168 Fed. Appx. 883, 889-90 (11th Cir. 2006) (holding that sexual jokes, offensive comments to female employees about their bodies and sex lives did not "rise to the level of discrimination" even when made on a regular basis). Furthermore, "(as in all) harassment cases, [the relevant] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*

*v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81 (1998)(finding that whether harassment was based on a protected characteristic requires consideration of the social context in which particular behavior occurs and is experienced).

An examination of the actual alleged conduct and comments shows that many of the incidents were not based on sex and therefore cannot be considered as part of any alleged harassment. Specifically, the context surrounding Pollock brushing against or touching Saunders and Riveras as he maneuvered around them in the tight space of the meat freezer shows that the conduct was not based on sex. Due to size of the freezer and the space in which the associates worked on delivery days, it was difficult for associates to move around the pallets, shelves, and freezers on those days. Dkt. 84-3 at 48:8-50:20; Dkt. 84-2 at 125:1-128:14. Moreover, Pollock was described as a six-foot tall, hefty man who did not move very quickly. Dkt. 84-2 at 121:19-21, 127:6-7; Dkt. 84-5 at 103:9-12. Thus, when Pollock and Saunders had to unload and sort deliveries, unintentional touching and or brushing up against another associate could occur. Dkt. 84-2 at 106:21-25, 121:19-21, 123:21-124:25, 125:7-10, 126:1-17, 127:6-7, 130:22-131:3. There is no evidence to suggest Pollock touched Saunders while maneuvering around her in the freezer on truck delivery days for any reason other than needing to maneuver around her in the freezer. Indeed, Saunders testified it was only on truck delivery days that he would touch her hips or upper shoulder to pass by her. Dkt. 84-2 at 125:1-18.

28

Likewise, Pollock staring at Saunders and Riveras does not amount to conduct based on sex.  Similarly, Pollock warning Saunders that she could injure her breast and comparing meat products to body parts were not sexual comments under the law, but, at best, were comments merely tinged with sexual connotation.  Such conduct is not sufficient to establish that there was harassment because of sex.  *See McMillan v. Postmaster General, U.S. Postal Service*, 634 Fed. Appx 274, 276 (11th Cir. 2015).

Saunders' and Riveras' own testimony about their relationship with Pollock further demonstrates that the conduct was not discrimination because of sex. Saunders testified that she and Pollock had a friendly working relationship, he was very helpful and nice, and they would frequently chat while working together in the meat department. Dkt. 84-2 at 178:15-19, 174:14-24, 179:6-19. Riveras testified that the associates working in the meat department all got along, would listen to music and tried to have a little fun. Dkt. 84-3 at 54:12-56:15. Riveras described the relationship between Saunders and Pollock as familial, perhaps even as a grandfather and granddaughter. Dkt. 84-3 at 86:11-25.  Furthermore, neither Saunders nor Riveras ever told Pollock to stop or that his behavior made them uncomfortable. Dkt. 84-2 at 168:18-22, 170:4-7, 180:21-181:1; Dkt. 84-3 at 81:16-82:9

9534665v1

**B.     The alleged conduct and comments do not rise to the level of severe or pervasive**

"[T]o be actionable under the statute, the Supreme Court has 'made it clear that [the] conduct must be extreme'" and must alter "the terms or conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Mendoza* at 1245. Consequently, the Eleventh Circuit has consistently applied this heightened standard of severe or pervasive when analyzing whether alleged conduct is actionable or is merely offensive. *See e.g., Mendoza* at 1243 (concluding that a supervisor rubbing his hip against the plaintiff while touching her shoulder and smiling at her, making sniffing noises while staring at her groin, following her constantly, and staring at her was not sufficient); *Mitchell v. Pope*, 189 Fed.Appx. 911, 913–14 & n.3 (11th Cir. 2006) (affirming summary judgment for employer where employee alleged her supervisor made sexually overt statements, such as "your a** sure does look fine" and describing the sexual effect she had on him, tried to kiss her, lifted her over his head, rubbed up against her, and reached across her chest); *Dar Dar v. Associated Outdoor Club, Inc.*, 248 Fed.Appx. 82, 85 (11th Cir. 2007) (finding co-workers touching plaintiff on the buttocks twice, asking if she wore panties with a "built-in butt," and telling plaintiff about co-worker's genital size did not constitute severe behavior); *Lockett* v. *Choice Hotels Intern. Inc.,* 315 Fed.Appx. 862, 863–64 (11th Cir. 2009) (holding that comments about sexual positions, that "he would go down on [her] good," that her boyfriend "ain't F'ing

30

[her] right," and that she needed "to get with a real guy" were offensive but not severe); *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 838 (11th Cir. 2021) (applied a common-sense approach in finding that a co-worker talking about vaginas, including plaintiff's vagina, exposing her stomach and chest to plaintiff, gesturing inserting something into plaintiff's vagina, and embracing plaintiff and kissing her on the cheek, among others, were not severe and pervasive); *Ricks v. Indyne, Inc.*, 2022 WL 8022536, at *1 (11th Cir. Oct. 14, 2022) (holding that a co-worker trying to hug and kiss the plaintiff, suggesting that they "hook up", possessively referring to plaintiff, commenting about trading plaintiff in for his wife, asking her to sit on his lap or feel her rear end, and commenting that anyone in the office would love to have sex with him did not create a hostile work environment). Just as the conduct in the cited cases did not alter the terms and conditions of employment, the prevailing standard in this Circuit renders the conduct at issue in this case insufficient as well.

None of the alleged behavior or comments that the EEOC claims occurred are severe or pervasive. The requirement that the harassment be "severe or pervasive" contains both an objective and subjective component. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir.2002). Not only must Saunders, Riveras, and Villalobos find the actions to be subjectively abusive, the objective severity of the harassment must be examined by looking at the totality of the circumstances by

considering: "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza* at 1245. The offensive behavior "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] ... to be abusive." *Miller* at 1276. Indeed, "[a]ll the sexual hostile work environment cases decided by the Supreme Court has involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the plaintiff's work environment." *Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1027-28 (11th Cir. 2008). In the instant case, none of the alleged conduct could reasonably be considered severe or pervasive.

### 1.    *Saunders was not subjected to severe or pervasive conduct by her co-worker, Pollock.*

Saunders testified that for approximately 3 to 4 weeks, she noticed Pollock would periodically stare at her while she worked. Dkt. 84-2 at 256:18-20. Then, Saunders testified that beginning at the end of July 2018, to the beginning of August 2018, Pollock began making inappropriate comments and invading her personal space. Dkt. 84-at 108:14-15, 109:6-10, 144:22-25. Specifically, according to Saunders, during the course of a month and a half, Pollock

- touched her hips or back while maneuvering around her in the meat freezer;

- between five to ten times warned her that she could injure her breasts while working;
- commented four times on her breast size;
- once warned her that her breasts moved when she moved her arms;
- once made a comment about the cold and her nipples;
- once commented that Saunders could "fill out a pair of jeans";
- once slapped Saunders' butt;
- once compared vaginas, including hers, to butterflied pork chops; and,
- made three comments about her breasts.

Dkt. 84-2 at 121:1-13, 116:12-19, 117:5-10, 119:25-120:10, 144:17-21, 144:22-25, 258:5-12, 264:17-4. Dkt. 84-3 at 69:11-70:14.

In viewing the totality of the circumstances, there is no genuine issue of material fact that Pollock's alleged harassment of Saunders created a hostile work environment. First, the alleged conduct was not frequent. Saunders identified, at best, a dozen incidents over a three-month period. This period is "far shorter than the years of daily harassing conduct [the Eleventh Circuit] found to be frequent in *Reeves*." *Lockett,* 315 Fed.Appx at 866 (finding comments over a period of four months not sufficiently frequent). Furthermore, a dozen incidents, especially when many of them were not even based on sex, are not enough to constitute frequent behavior. *See Mitchell,* 189 Fed.Appx. at 911(affirming summary judgment when there were 16 incidents of offensive conduct, including the supervisor's attempts on three occasions to touch the employee and kiss her and numerous incidents of sexual and offensive remarks).

Second, even if the conduct was frequent, it was not severe. Comparing the behavior alleged by Saunders to Eleventh Circuit case law clearly establishes that the behavior was not sufficiently severe to constitute unlawful harassment. Saunders did not complain about any sexual touching, graphic comments, sexual propositions, or lewd comments; rather, she complained of "ordinary tribulations in the workplace" such as "abusive language, gender-related jokes, and occasional teasing", none of which is protected by Title VII. *Faragher*, 524 U.S. at 788.

Third, the behavior was not physically threatening. Saunders did not identify any behavior or comments whereby Pollock threatened her, made physically aggressive gestures toward her, or acted in a sexually predatory manner. *See Mendoza*, 195 F.3d at 1248-49 (holding that telling an employee he was getting "hired up", making sniffing sounds while staring at the plaintiff's crotch, brushing hips against hips and following the plaintiff around not physically threatening); *Alexander v. Opelika City Schools*, 352 Fed.Appx 390, 392 (11th Cir. 2009)(holding that comment about tying a noose around a person's neck was not physically threatening).

Fourth, there is no evidence that Pollock's alleged behavior interfered with Saunders' work performance. In fact, Saunders herself testified that she was a good employee and was able to perform her job satisfactorily during her entire employment at Walmart. Dkt. 84-2 at 173:23-174:5. Moreover, Saunders' actions

(or, rather, inaction) demonstrate that the allegedly harassing conduct was not sufficiently severe or pervasive to alter the terms or conditions of her employment. *See e.g., Ricks*, 2022 WL 8022536, at *4 (finding that because plaintiff did not report co-worker harassment to superiors and dismissed her supervisor's offer to intervene, plaintiff's inaction evidenced that the harassing conduct was not sufficiently severe or pervasive to alter an employee's terms or conditions of employment). Like the plaintiff in *Ricks*, Saunders never asked Pollock to stop the behavior, did not complain about Pollock's allegedly harassing behavior to a salaried member of management until six weeks after it allegedly began, dismissed Harrison's offer to escalate her concerns to upper management, and never reported the alleged harassing conduct through Walmart's Global Ethics hotline. Because the alleged conduct does not meet this Circuit's heightened standard of severe or pervasive, this Court should grant summary judgment in favor of Walmart on the EEOC's claim of sexual harassment as it relates to Saunders.

### 2. *Riveras was not subjected to severe or pervasive conduct by her co-worker, Pollock.*

Riveras' allegations of Pollock's conduct are primarily based on her observing Pollock's interactions with Saunders during the six shifts all three worked together between September 2, 2018, and October 1, 2018. According to Riveras, she observed Pollock looking in Saunders and Riveras' direction and smiling, touching Saunders when he maneuvered around her, slapping Saunders on the butt once, and

she heard Pollock make one comment comparing female breasts to chicken breasts. Dkt. 84-3 at 61:4-15, 62:3-12, 63:6-8, 69:11-70:14; 71:3-5, 90:9-16, 91:19-20, 93:7-10. Although the Eleventh Circuit has recognized claims for sexual harassment when the plaintiff is not individually targeted, the conduct Riveras complains about is not sufficiently gender-specific, or severe or pervasive.  As explained above, Saunders' own allegations do not amount to severe or pervasive under the standards of this Circuit, thus, Riveras claims of witnessing a portion of such conduct cannot be considered severe or pervasive.

In addition to observing Pollock's interactions with Saunders, Riveras also alleges that for approximately one week, Pollock placed his hand on her waist or brushed up against her a few times when he walked by her on the sales floor, and once watched her bend over while restocking, then laughed and said he would need to be "extra nice to his wife that night."  Dkt. 84-3 at 76:9-77:8, 89:3-21, 109:18-23. These few incidents are insufficient to constitute unlawful harassment under the standard set by the Eleventh Circuit. First, the behavior was not frequent but instead consisted of only a few instances of brushing by her during work and one comment. Second, the behavior was not severe. Third, the behavior was not physically threatening. Fourth, Riveras does not have any evidence that the behavior interfered with her work performance. Consequently, a few non-sexual physical touches while passing by each other and one inappropriate comment cannot, by law, constitute

36

severe or pervasive conduct. *See Faragher,* 524 U.S. at 788 ("Offhand comments and isolated incidents will not amount to discriminatory changes in terms and conditions of employment."). Therefore, this Court should grant summary judgment in favor of Walmart on   the EEOC's claim of sexual harassment as it relates to Riveras.

### 3. *Villalobos was not subjected to severe or pervasive conduct by her co-worker, Pollock*

Like Saunders and Riveras, the EEOC's claim of sexual harassment for Villalobos does not meet the severe or pervasive standard. Villalobos testified that the only alleged inappropriate encounter she had with Pollock was when he walked up beside her, placed his arm around her waist and told her what he had eaten the night before. Dkt. 84-5 at 89:19-17, 94:16-104:12. While Villalobos may not have appreciated Pollock briefly touching her waist, Title VII is not meant to act as a "general civility code." *Faragher,* 524 U.S. at 788. Rather, Villalobos' claim fails to meet the objective standard articulated in *Mendoza* in that no reasonable person would find Pollock's behavior towards Villalobos was sufficiently severe or pervasive to alter the terms and conditions of her employment.

To the extent the EEOC argues Villalobos was subjected to sexual harassment because she observed Pollock sexually harassing other associates, this claim also fails. Villalobos testified that before Pollock approached her on October 30, 2018, she did not know Riveras or Saunders had a complaint against Pollock. Dkt. 84-5 at

37

77:20-78:3. Villalobos never worked in the Meat Department and never worked directly with Pollock, Saunders, or Riveras. Dkt. 84-5 at 68:20-25, 69:1-11, 70:17-25. Indeed, Villalobos never saw any interaction between Saunders and Pollock or between Riveras and Pollock, and was surprised to learn of their complaints because she thought Pollock seemed like a nice guy and got along with everyone. Dkt. 84-5 at 71:15-21, 73:5 – 14, 85:8-86:13. Accordingly, the Court should grant summary judgment in favor of Walmart on the EEOC's claim of sexual harassment as it relates to Villalobos.

### B.    Walmart took prompt and appropriate remedial action when it received notice of the complaints.

To establish a basis for holding Walmart liable for the harassing conduct of a co-worker, the EEOC must demonstrate that Walmart 'knew or should have known of the harassing conduct but failed to take prompt remedial action.'" *Banks v. City of Atlanta, Georgia*, 2022 WL 4587869, at *1 (11th Cir. Sept. 30, 2022) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002)). When an employee is relying on constructive knowledge, "an employer is insulated from liability under Title VII for a hostile environment sexual harassment claim *premised on constructive knowledge* of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternative means of redress." *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir.1997).  Once an employer has knowledge

38

of the harassing conduct, an employer "need not act instantaneously[ ] but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001). The fact that the alleged harassing conduct does, in fact, stop, is dispositive to this issue of whether an employer's actions are adequate, regardless of whether the process was somehow defective. *See Anderson v. Surgery Ctr. of Cullman, Inc*., 839 Fed. Appx 364, 372 (11th Cir. 2020). The burden lies with the EEOC to establish a basis for holding Walmart liable. *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, at 802 (1973). As demonstrated below, the EEOC fails to meet this requirement.

### 1. *Walmart was not placed on notice of the alleged harassing conduct until September 20, 2018, and cannot be held liable for any conduct that occurred prior to that date.*

"[O]nce an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." *Madray v. Publix Supermarkets, Inc.,* 208 F.3d 1290, 1300 (11th Cir. 2000) (internal citation omitted) (finding plaintiffs did not place defendant on notice of harassing behavior when plaintiffs failed to make their complaints to the designated company representative). An employer will not be placed on actual (or constructive) notice of the alleged sexual harassment if the employee fails to follow the procedures in place to promptly

9534665v1

report harassment to the appropriate designated authority. *See Banks*, at \*2. For the EEOC to prevail on a claim of sexual harassment, the EEOC must present admissible evidence to support a finding that Saunders, Riveras, and Villalobos took "full advantage of the employer's preventative measures." *Id.,* at \*2 (citing *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1306-07 (11th Cir. 2007)).

Walmart's Discrimination and Harassment Prevention Policy is provided to associates upon hire, reviewed during annual trainings, and available through Walmart's intranet. Dkt. 84-2 at 26:25-28:5, 30:4-12, 34:1-14, 354; Dkt. 84-3 at 25:24-25, 33:9-12, 34:7-10, 35:7-16, 313, 354.  Moreover, posted in the Personnel Office in the store is information regarding how to contact the Global Ethics Hotline either directly or anonymously for reporting harassment. Dkt. 84-5 at 49:19-50:6; Dkt. 86 at 99:7-15. Walmart's policies and training state that associates need to immediately report any concern of harassment to any **salaried** member of management, or associates can report their allegations to the Global Ethics Office by phone, online portal, or by email. Dkt. 84-2 at 30:4-22, 35:5-11; Dkt. 84-3 at 30:7-35:22; Dkt. 84-5 at 46:17-47:9, 53:19-56:11. In the instant case, Walmart exercised reasonable care by having a well-disseminated anti-harassment policy, of which Saunders, Riveras, and Villalobos had knowledge of and were trained on throughout their employment.

While the EEOC argues that the harassing behavior began as early as June 2018 when Pollock allegedly stared at Saunders, Walmart was not placed on notice until it first became aware of the offensive comments and conduct on or around September 20, 2018, when Saunders first reported it to Huckabee, a salaried member of management. Dkt. 84-2 at 149:5-15; Dkt. 84-3 at 58:2-20. During their employment, neither Riveras nor Saunders ever contacted the Global Ethics Department using the telephone number, email address or open-door hotline number provided by Walmart to report any inappropriate behavior by her co-worker, Pollock. Dkt. 84-2 at 128:23-129:9, 138:11-139:2, 140:25-141:13, 141:7-13; Dkt. 84-3 at 33:17-35:1. Although Saunders had previously reported to Harrison that Pollock made her feel uncomfortable, Harrison was not a salaried member of management.  Dkt. 84-4 at 2, ¶9. When an employer has designated a specific level of management as appropriate for receiving complaints of sexual harassment, an employee's complaint to anyone less does not place the employer on notice. *Banks*, at *2 (citing *Madray,* at 1300 (holding that complaints to mid-level managers, not designated as appropriate representatives by the anti-harassment policy, did not place the employer on notice of the alleged sexual harassment)).

In this case, Walmart's policy clearly required reporting to a salaried member of management.  Saunders reporting to Harrison was not enough to put Walmart on notice. Consequently, Walmart cannot be held liable for any allegedly inappropriate

9534665v1

conduct by a co-worker that occurred prior to Saunders and Riveras complaining to Huckabee, a salaried manager. Even if the complaint to Harrison was enough to trigger a duty to act by Walmart, Saunders testified that after she complained to Harrison, he moved her to a different department and the only thing that happened thereafter was four innocuous comments that were not sex based and do not amount to severe or pervasive behavior. *Supra* p. 13.

Both Saunders and Riveras testified that after they complained to Huckabee about Pollock's behavior, no further inappropriate comments or behavior occurred. In fact, the only behavior alleged to have occurred after the complaint to Huckabee was that Pollock brushed by Saunders and stood close to her. Dkt. 84-2 at 146:13-25. Because no further sexually inappropriate behavior or comments occurred after the complaint, the EEOC's claim of sexual harassment fails and summary judgment in favor of Walmart is appropriate.

## 2. *Walmart properly investigated the complaints and took appropriate remedial action.*

It is clearly established that when the employer's response to a complaint of harassment is appropriate and reasonable, and the employer takes remedial action that is likely to prevent future harassment, the employer is not liable. *Jackson v. Hennessy Auto*, 190 Fed. Appx. 765, 767 (11th Cir. 2006). Furthermore, the Eleventh Circuit has recently held that an employer will also not be held liable if, even when

the process is somehow defective, no further harassing conduct occurs after the employer has been placed on notice. *See Anderson,* 839 Fed. Appx at 372 ("Most importantly, and dispositive of this issue, Lackey admits that there was no sexual harassment after she and the other nurses filed their complaints; this demonstrates that SCA's remedial actions were adequate.") (citing *Baldwin*, 480 F.3d at 1305 ("We have held that even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the defense is still available if the remedial result is adequate. In other words, a reasonable result cures an unreasonable process.") and *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1288 (11th Cir. 2003) ("[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow.")).

The EEOC's dissatisfaction with Walmart's investigation of the alleged conduct does not establish its claim. *See McIntyre v. Delhaize Am., Inc.*, 2009 WL 1039557 at *4 (M.D. Fla. 2009), aff'd, 403 Fed.Appx 448 (11th Cir. 2010)(an employer's failure to investigate an alleged wrongdoer's conduct to the plaintiff's satisfaction is insufficient to constitute a ratification of wrongdoer's alleged illegal conduct); *Hannan v. Boca Raton Regional Hosp.*, 2012 WL 1578081 (Fla. Cir. Ct. 2012) ("Whether Plaintiff disagrees on whether the scope of the investigation was thorough enough does not lead to a ratification…"). Rather, the Eleventh Circuit has

warned that it will not sit as a "super-personnel department" and reexamine a company's business decision. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)). Therefore, even if Walmart failed to implement its internal policies to the letter, as the EEOC argues, it does not invalidate Walmart's otherwise prompt, and effective, corrective action, and it does not establish employer liability. *Id.* The undisputed evidence demonstrates that after Walmart received notice of the alleged inappropriate behavior and comments, no further alleged sexual harassment occurred.

Furthermore, the undisputed evidence demonstrates that Walmart conducted a prompt and thorough investigation under the circumstances. The same day Huckabee received notice of Saunders and Riveras complaint, he met with them and asked them to write a statement detailing their specific allegations against their co-worker, Pollock. Dkt. 84-8 at 176:8-15, 181:15-183:24. Then, approximately a week later, after Saunders displayed reluctance in participating further in the investigation, Huckabee and Huffstutler met with Saunders to further encourage her to provide specifics related to her complaint. Dkt. 84-2 at 163:3-165:24; Dkt. 84-8 at 60:8-11. Once Saunders finally provided a statement detailing the allegations against Pollock, her and Riveras' complaints were escalated to Global Ethics, a case was opened, and assigned to Wilcox for investigation. Dkt. 84-8 at 173:2-23, 322. Riveras, on the

44

other hand, refused to provide a statement or participate further in the investigation, despite Huckabee asking her "daily" to provide one.  Dkt. 84-3 at 113:2-22.

After Wilcox was assigned to investigate the specific complaints against Pollock, Wilcox and other members of management were made aware Hurricane Michael, a Category 5 Hurricane, was going to make landfall on or near Store #1134. Dkt. 84-8 at 178:15-19; Dkt. 84-4 at 5, ¶20. Consequently, store management, including Wilcox, Huckabee, Huffstutler, and Bradley, were focused on emergency preparedness and, subsequently, disaster relief. Dkt. 84-4 at 5, ¶20.  During this time, Riveras testified that she did not experience any harassing conduct by Pollock.  Dkt. 84-3 at 120:5-18.  Then, on November 1, 2018, before Wilcox could finalize his investigation into Riveras and Saunders' complaint, Villalobos complained to Huckabee about Pollock putting his arm around her, which prompted a second investigation. Dkt. 84-5 at 90:4-7, 93:14-17. Similar to Riveras and Saunders, Villalobos testified that after she complained, no other offensive conduct occurred. Dkt. 84-5 at 115:3-124:16, 142:23-145:23. On November 15, 2018, Walmart concluded all its investigations into the allegations against Pollock and Pollock was terminated.  Dkt. 84-7 at 3, ¶9.

The promptness and adequacy of Walmart's response and Pollock's termination was reasonable, despite the lack of cooperation from Saunders and Riveras to provide detailed complaints and the disruption caused by a Category 5

Hurricane. Within two weeks of receiving Villalobos' complaint, which arguably is not one of sexual harassment at all, (and without a Category 5 Hurricane to contend with), Wilcox investigated, conducted interviews, and made the decision to terminate Pollock. Therefore, the EEOC cannot establish a basis for holding Walmart liable.

## II. The EEOC's Claim of Retaliation Against Saunders Fails as a Matter of Law

There is no direct evidence of retaliation in this case. Accordingly, the *McDonnell Douglas* burden-shifting framework applies. *Tarmas v. Sec'y of the Navy*, 433 Fed. Appx 754, 761 (11th Cir. 2011). Under that framework, the EEOC must first establish its prima facie case of retaliation. *Id.* If it meets that burden, the burden shifts to Walmart to articulate one or more legitimate, non-retaliatory reasons for its actions. *Id.* Once Walmart articulates a reason, the EEOC must then come forward with evidence that Walmart's explanation is mere pretext. *Id.* "To establish the necessary causation, a plaintiff must demonstrate that 'her protected activity was a but-for cause of the alleged adverse action by the employer.'" *Gogel v. Kia Motors Manufacturing of Ga., Inc.,* 967 F.3d 1121, 1135 (11th Cir. 2020).

Summary judgment is appropriate on this claim because the EEOC cannot establish a *prima facie* case of retaliation. Specifically, the EEOC cannot establish a causal connection between Saunders' termination and her complaint of sexual

9534665v1

harassment.  Furthermore, the EEOC cannot present any evidence that Walmart's proffered legitimate, non-retaliatory reason is merely pretext for retaliation.

### A.    The EEOC cannot establish a prima facie case.

To establish a *prima facie* case of retaliation under Title VII, the EEOC must show: (1) that the individual engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). "While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Gogel v. Kia Motors Manufacturing of Georgia, Inc.,* 967 F.3d 1121, 1190 n.15 (11th Cir. 2020).  "As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression." *Martin v. Financial Asset Management Sys., Inc.,* 959 F.3d 1048, 1053 (11th Cir. 2020). Such knowledge "must be supported by reasonable inferences from the evidence, not mere speculation."  *Id.*; *see also Strickland v. Water Works and Sewer Bd.,* 239 F.3d 1199, 1207 (11th Cir. 2001)(holding that evidence of a short time lapse between the protected activity and termination cannot satisfy the causation element of an FMLA retaliation claim where the unrebutted evidence is that the decisionmaker did not have knowledge that the employee had engaged in protected conduct).

Bradley, who made the decision to terminate Saunders, was unaware of any protected activity by Saunders.  Dkt. 84-4 at 4, ¶16. It is undisputed that on the morning of September 19, 2018, Bradley was not aware of Saunders' earlier complaint to Harrison. *Id.* Bradley was aware that Saunders had seven attendance occurrences as early as August 10, 2018. Dkt. 84-4 at 4, ¶15. She spoke with Saunders about her occurrences and suggested that Saunders contact Sedgwick to have some of the occurrences covered as protected leave so that Bradley would not have to terminate her employment. *Id.* Bradley gave Saunders time to do this, but Saunders chose not to do so. *Id.* Instead, despite being warned about her attendance, Saunders incurred an additional occurrence point on the morning of September 19, 2018.  Dkt. 84-4 at 4, ¶16. Bradley was advised of this occurrence via email when it occurred and made the decision to terminate Saunders employment because Saunders had not initiated a claim with Sedgwick and continued to incur attendance violations. *Id.* Before Bradley could implement her decision to terminate Saunders, Bradley was advised that Saunders had made a complaint of harassment[10]. *Id.*

---

[10] It is worth noting that Saunders did not bring forth a complaint under Walmart's policy until after she amassed yet another attendance occurrence. The Eleventh Circuit has "emphasize[d] that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010).  Indeed, "Courts have cautioned against finding causation when a plaintiff receives multiple 'warnings about her performance before her alleged protected activity,' as this severs the causal connection necessary for a prima facie case." *Hall v. AT&T Mobility Svs., LLC*, No.

Bradley held off executing her termination decision until she had the opportunity to speak with Huffstutler to make certain the intervening complaint raised by Saunders did not negate her prior decision to terminate. Dkt. 84-4 at 4, ¶17. As these undisputed facts establish, Bradley made the decision to terminate Saunders before she learned of any protected activity and therefore the EEOC cannot, as a matter of law, establish a prima facie case.

The EEOC has no evidence to dispute these facts. However, even if one were to assume that Bradley knew about Saunders' earlier complaint to Harrison, of which there is no evidence, the EEOC's claim for retaliation still fails. "Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." *Henderson v. FedEx Express*, 442 F. App'x 502, 507 (11th Cir. 2011). Saunders brought her concern to Harrison in August 2018. Saunders thereafter committed an attendance infraction and received an occurrence under Walmart's policy on September 19, 2018. Dkt. 84-4 at 4, ¶16. This intervening act of misconduct that warranted termination serves to severe any causal connection

---

6:10-cv-150, 2011 WL 3425642, at *10 (M.D. Fl. Aug. 5, 2011) (citing *Spence v. Panasonic Copier Co.*, 46 F. Supp. 2d 1340, 1348–49 (N.D.Ga. 1999) (collecting cases from the Third, Seventh, Eighth, and Eleventh Circuits), aff'd, 204 F.3d 1122 (11th Cir. 1999)). Here, Saunders knew she had amassed occurrences in violation of the attendance policy prior to her complaint about Pollock and was well aware that she was subject to termination for this violation.

between the protected activity and the adverse action. Accordingly, the EEOC cannot establish a prima facie case.

**B.    Walmart terminated Saunders' employment for a legitimate, non-retaliatory reason.**

Even assuming the EEOC can establish a causal connection, which it cannot, the retaliation claim still fails. "Once a plaintiff establishes a prima facie case of [retaliation], the defendant-employer must articulate a legitimate, non-[retaliatory] reason for the challenged action." *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (internal citations omitted). Walmart's burden is merely one of production; it "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 1242–43. As is clear from the evidence and record, Saunders was terminated due to her excessive absences in violation of Walmart's attendance and punctuality policy. As early as July of 2018, Saunders was placed on notice that she was in violation of Walmart's attendance policy. Dkt. 84-4 at 4, ¶15. However, rather than terminate her employment at that time, Bradley gave her an opportunity to apply for an accommodation through Walmart's third party leave administrator, Sedgwick. *Id.*   Saunders never contacted Sedgwick.  Dkt. 84-2 at 63:13-15. Thus, by September 19, 2018, Saunders had amassed 7.5 attendance points for unauthorized absences and lateness. Saunders was aware prior to raising a complaint of harassment, and prior to her termination, that she was subject to termination under the attendance policy.  Dkt. 84-2 at 69:19-25. However, despite

50

this awareness, at no point in time during her employment did Saunders ask for an exception for any occurrences or ask for management review of any occurrences. Dkt. 84-2 at 101:23–102:6.

### C.   The EEOC cannot establish pretext or that but for Saunders' complaint, she would not have been terminated

The EEOC cannot establish that Walmart's legitimate business reason was a mere pretext for intentional retaliation. As the Eleventh Circuit explained in *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*), a plaintiff may not attempt to recast the defendant's legitimate reason by "substitut[ing] his business judgment for that of the employer," or "simply quarreling with the wisdom of that reason," assuming that the "reason is one that might motivate a reasonable employer." *Id.* In short, the EEOC must show that Walmart's proffered reason is "a cover-up for a . . . discriminatory decision," *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002), by showing the reason is so implausible, inconsistent, or incoherent that it is unworthy of credence, *Gogel*, 967 F.3d at 1136.  In addition, the EEOC must show that Walmart's reason for termination is not only unworthy of belief, but that **but for** the complaint, Saunders would not have been terminated. *See id.* (holding that "a reason is not pretext for [retaliation] 'unless it is shown both that the reason was false, *and* that [retaliation] was the real reason.'")(internal citations omitted). The EEOC cannot meet this burden.

A review of the evidence shows Saunders admitted she was absent on the dates she received occurrences and that she never asked for an exception. Dkt. 84-2 at 46:24-57:22.  Saunders admitted Bradley encouraged her to seek time off through Sedgwick. *Id*. at 66:17-69:25. Saunders admitted she never contacted Sedgwick or otherwise sought to have her occurrences excused. *Id*. Saunders was tardy on September 19, 2018 and received an occurrence under Walmart's policy. Saunders was aware she could be terminated for her excessive occurrences under the attendance policy. *Id*. at 88:13-22. In fact, Saunders even asked Huckabee whether she could still be terminated for her occurrences if she complained about sexual harassment. *Id*. at 86:18-87:6. These facts show no inconsistencies or contradictions, and conclusively establish that the EEOC cannot identify a genuine issue of material fact that the reason is unworthy of credence.

The EEOC attempts to establish pretext by arguing Walmart waited to terminate until after Saunders complained. This is not evidence of pretext. As the undisputed facts establish, Bradley was unaware of any complaint at the time Saunders incurred her final occurrence on September 19, 2018, and Bradley made the decision to terminate. Dkt. 84-4 at 4, ¶16.  Bradley had not terminated Saunders for her excessive occurrences before then because she was under the impression that Saunders was making a claim with Sedgwick to have some of those occurrences

excused.  *Id.* at ¶17.  When Saunders incurred yet another point without explanation or excuse, Bradley moved forward with termination.  *Id.* at ¶16.

The EEOC also attempts to establish pretext by arguing that Bradley and Pollock were friends.  This is simply inconsequential.  Even if true, this does not call into question the legitimacy of Walmart's reason or establish that Saunders would not have been terminated but for her complaint of harassment.

Saunders believes she was terminated in retaliation for raising a complaint because she thought that an investigation had not started by the time of her termination. This is not evidence of pretext. Even if Saunders' subjective belief were true, which it was not, this fails to even suggest that Walmart's reason for termination was unworthy of belief or that intentional retaliation was the but for cause of termination.

Importantly, the EEOC is unable to prove that Saunders was treated differently from other individuals with whom she was "similarly situated in all material respects."  *Lewis v. City of Union City,* 918 F.3d 1213, 1231 (11th Cir. 2019) (en banc).  A similarly situated comparator will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history. *Id.* at 1223-24.

The EEOC cannot identify an appropriate comparator because no other associate within the same department and reporting to Bradley incurred the same number of occurrences as Saunders. During her deposition, Saunders only identified associate Dylan Carroll as a potential comparator. Dkt. 84-2 at 58:3-7, 58:16-23, 62:4-7, 62:16-22. However, during his initial six months of employment, Carroll only had 2.5 occurrences and was not subject to termination under Walmart's Attendance and Punctuality Policy. Dkt. 84-4 at 7, ¶24. Additionally, the two associates the EEOC appears to claim as comparators were Kaitlin Owen, a sales associate, and Vanetra Reese, a self-checkout host. Dkt. 84-4 at 5, ¶18. First, neither one of these individuals held the same position as Saunders. *Id.* Second, neither reported to Bradley. *Id.* Third, Kaitlin Owen and Vanetra Reese both were terminated under the attendance policy. *Id.* Accordingly, the EEOC cannot identify a Cap I Associate reporting to Bradley who should have been terminated under the Attendance Policy but was not. Thus, the EEOC cannot show any appropriate similarly situated comparators.

The EEOC cannot show that Walmart's reason for termination was unworthy of credence.  It also presents no evidence to show that but for the complaint raised by Saunders, she would not have been terminated. No one told Saunders she was terminated for retaliation, no one told Saunders she should not have complained, no one told Saunders she would be retaliated against. Dkt. 84-2 at 86:14-17, 95:13-21.

54

Saunders herself does not even believe that her receipt of the occurrence on September 19, 2018 was retaliation. *Id.* at 57:14-17. Furthermore, at the time of her termination, Bradley marked Saunders eligible for rehire and told Saunders that she would rehire her once she became eligible under the policy. *Id.* at 77:16-25. Given these facts, the EEOC cannot establish Walmart was motivated by retaliation and would not have terminated Saunders but for her complaint.  Therefore, this Court should grant summary judgment in favor of Walmart on Saunders' retaliation claim.

## CONCLUSION

For the foregoing reasons, this Court should grant Walmart's motion for summary judgment in its entirety.

*/s/Angelique Groza Lyons*
Angelique Groza Lyons, Esq.,
Fla. Bar No. 118801
alyons@constangy.com
Secondary Email:  tampa@constangy.com
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
100 North Tampa Street, Suite 3350
Post Office Box 1840
Tampa, Florida  33601-1840
(813) 223-7166 / Fax:  (813) 223-2515
Attorney for Defendants

F. Damon Kitchen
Florida Bar No. 861634
dkitchen@constangy.com
Elizabeth H. Joiner

Florida Bar No. 107843
ejoiner@constangy.com
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
200 West Forsyth Street, Suite 1700
Jacksonville, FL  32202-4317
Telephone: (904) 356-8900
Facsimile: (904) 356-8200

**_Attorneys for Defendants_**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of May, 2023, I electronically filed with the Clerk of Court a copy of the foregoing document via the CM/ECF system, which will automatically serve a copy upon counsel for Plaintiff.

/s/Angelique Groza Lyons
Attorney

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

The undersigned counsel certifies that the word-processing software counts 12523 words in this filing, including headings, footnotes, quotations, case style, signature block, and certificates.

/s/Angelique Groza Lyons
Attorney

9534665v1