## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**,

      **Plaintiff**,

**v.**                                 **Case No. 3:21cv1051-TKW-HTC**

**WALMART, INC.** and
**WAL-MART STORES EAST, LP**,

      **Defendants**.

_____/

## <u>ORDER ON SUMMARY JUDGMENT MOTIONS</u>

This case is before the Court based on Defendants' motion for summary judgment (Doc. 85) and Plaintiff's motion for partial summary judgment (Doc. 87). Upon due consideration of the motions, the responses in opposition (Docs. 91, 93), the replies (Docs. 100, 101), and the nearly 6,000 pages of evidence submitted by the parties (attachments to Docs. 84, 86, 92), the Court finds for the reasons that follow that each motion is due to be granted in part and denied in part.

### I.    Facts

Plaintiff, the Equal Employment Opportunity Commission (EEOC), brings this Title VII[1] employment discrimination case against Defendants Walmart, Inc.

---

[1] Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§2000e, et seq.

and Walmart Stores East, LP (collectively "Walmart") on behalf of former Walmart employee[2] Joelle Saunders and a "class" of similarly situated female employees consisting of Destiny Riveras and Caroline Villalobos (collectively "the Aggrieved Employees"). The case arises out of the alleged sexual harassment of the Aggrieved Employees by a co-worker, James Pollock, from June to November 2018.

Claims of sexual harassment require a fact-intensive analysis, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999), and "the context of offending words or conduct is essential" to determining the viability of the claims, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010). Thus, the Court closely reviewed the evidence of record to determine what the facts are (or what a jury could find them to be) and whether those facts support the claims asserted by the EEOC.

The Court begins its discussion of the facts by summarizing Walmart's relevant complaint reporting policies. Then, the Court describes in detail the evidence pertaining to the alleged harassment of each Aggrieved Employee.

---

[2] Walmart refers to its employees as "associates," and this Order uses the terms "employee" and "associate" interchangeably.

A.     Walmart's Complaint Reporting Policies

There are two relevant complaint reporting policies in this case: the Open Door Communications Policy ("Open Door Policy") and the Discrimination and Harassment Prevention Policy ("Harassment Policy").

The Open Door Policy authorizes Walmart associates to report  any type of grievance, complaint, or concern to Walmart management.  Doc. 92-16.  "Anything related to Walmart is a fair subject to raise in an open door communication …."  *Id.* at 1.  The policy "encourage[s] [associates] to give [their] <u>immediate supervisor</u> the first opportunity to listen, address, and resolve ideas, suggestions or concerns."  *Id.* (emphasis added).

The Harassment Policy is specific to complaints about protected class based discrimination or harassment, such as sexual harassment.  Doc. 92-13.  It allows Walmart associates who "experience, observe, or become aware of any conduct that may violate this policy" to report the violation to "any <u>salaried member of management</u> or … to [Walmart]'s Global Ethics Office."  *Id.* at 3 (emphasis added).  The Global Ethics Office is a central corporate office that oversees investigations above the store level.

The Open Door Policy does not distinguish between non-salaried "supervisors" and salaried "managers" for reporting purposes, and it only mentions

the Global Ethics Office with regard to "concern[s] or problem[s] related to [Walmart's] Statement of Ethics."  Doc. 92-16 at 2.

### B.  Saunders' Interactions with Pollock

Saunders began working in the meat department of a Walmart store in DeFuniak Springs, Florida, in April of 2018.  Doc. 92-1 at 10.  She worked as a "Fresh Cap Associate" in the meat department.  *Id.*

Fresh Cap Associates were responsible for, among other things, keeping track of inventory, stocking shelves, and helping to unload supply trucks as they delivered fresh meat to the store.  Doc. 92-7 at 244-46.  Fresh Cap Associates would split their working hours between the "freezer"—a walk-in room, between 12 by 15 feet and 20 by 30 feet,[3] where meat and other products were stored long-term—the "cooler" or "prep room"—a room slightly deeper than the freezer but roughly the same width where products were prepped before being stocked on the sales floor—and the "sales floor"—the portion of the store that customers traverse.[4]

---

[3]  Saunders testified that the freezer was "[a] little bigger than" the room she was deposed within, which counsel estimated to be either 12 by 15 feet or 20 by 30 feet.  Doc. 92-1 at 40.

[4]  In their depositions, Saunders and Riveras used the terms "freezer" and "cooler" inconsistently, making it difficult to discern where certain events took place.  *Compare e.g.*, Doc. 92-7 at 70 (Riveras testifying that she saw Pollock slap Saunders' buttocks on a ladder in the freezer); *id.* at 48-49 (Riveras testing that pallets were stacked in the middle of the freezer), *with* Doc. 92-1 at 133 (Saunders testifying that Pollock slapped her buttocks on a ladder in the cooler); *id.* at 125-26 (Saunders testifying that pallets were stacked in the middle of the cooler) (all emphases added).  Saunders also used the term "prep room," which Riveras did not use.  For purposes of this Order, the Court uses the term "freezer" to mean the room described in both depositions where pallets were stacked in the middle, creating two passageways on either side.

When trucks made deliveries to the store, the Fresh Cap Associates would unload pallets from the truck into the freezer. *Id.* at 39-40. On these "truck days," which happened at least twice a week,[5] multiple Fresh Cap Associates would be navigating the freezer at once while pallets were stacked in the middle of the freezer, creating narrow passageways on either side of the pallets. *Id.* at 44-50.

Saunders met Pollock when she began working in the meat department. Doc. 92-1 at 114. For the first month of Saunders' employment, she maintained a friendly but limited relationship with Pollock, describing him as a "decent man" and a bit of a "fatherly figure."[6] *Id.* at 254-55. However, starting in June 2018, there was a noticeable change in Pollock's behavior towards Saunders. *Id.* at 258. Saunders noticed Pollock frequently staring at her during downtime at work and getting unnecessarily close to speak to her, often leaning down and speaking directly into her ear. *Id.* at 136, 139-40.

Around this time, Pollock also started frequently "scooting" past her in the freezer, pushing his body up against hers and grabbing her hips or back as he passed behind her. *Id.* at 124-27. Saunders would push up against the shelves in the freezer

---

The Court uses the term "cooler" to mean the room described in both depositions containing worktables.

[5] Riveras testified that the trucks came every day, Doc. 92-7 at 43, but Saunders testified that trucks only came twice a week, Doc. 92-1 at 107.

[6] Saunders was in her late 20s at the time, Doc. 92-1 at 214, and Pollock was "upwards of 60," *id.* at 114.

as Pollock passed to get as far from his body as possible, but Saunders felt that Pollock would linger behind her for longer than necessary.[7]  *Id.* at 126.  Once it began, Pollock would scoot behind Saunders in this manner on at least every truck day.  *Id.* at 259.  Pollock did not scoot past Saunders in this way during her first month of employment, and Saunders never saw Pollock scoot behind any of his male co-workers.  *Id.* at 258.

In addition to the scooting, Pollock would also rub Saunders' middle and upper back "as a way of saying hello" when he passed her in the cooler.  *Id.* at 128-29.  This happened about one out of every two times Pollock saw Saunders, and Saunders never saw Pollock do this to any other co-worker.  *Id.*

Pollock also began making inappropriate comments to Saunders.  He told her (once) that she "shouldn't move [her arms] around like that because [her] boobs move with them," *id.* at 111;  he told her (five to ten times) that she would "ruin [her] boobs" if she leaned on ladders in the freezer, *id.* at 121; he tried (once) to guess her bra size, *id* at 119-20; he told her (once) that her "cup size [would] go up" if she lifted heavy things, *id.* at 111, 167-68, and then later asked if her cup size had gone up yet, *id.*; he told her (once) that he was "a breast man" who liked "nice

---

[7]  Saunders at first estimated that Pollock would linger for up to 40 seconds while holding her hips, but she conceded that it was "probably not" quite that long when challenged.  Doc. 92-1 at 127-28.  Riveras testified that she witnessed Pollock hold onto Saunders for at least 60 seconds when scooting by.  Doc. 92-7 at 64.

mountains with pointy snow caps" and that she "fit the description," *id.* at 168-69;

he referred to breasts (once) as "all day suckers," *id.* at 169; and once after Saunders

complained of being cold after exiting the freezer, Pollock opened her jacket,

"look[ed] to see if [her] nipples were erect," and then commented that she obviously

had not been in the freezer long enough, Doc. 86-5 at 2; Doc. 92-1 at 111.  None of

these comments were solicited or otherwise prompted by conversation—they "came

out of left field, … he would just kind of volunteer his opinions on female anatomy."

Doc. 92-1 at 169.

In late July or early August of 2018, Saunders approached Ricky Harrison, a

non-salaried "Fresh Cap Supervisor," to complain about Pollock's inappropriate

behavior.  *Id.* at 107-09.  She gave Harrison examples of the behavior summarized

above, including the unwanted touching, Pollock's "scooting" habit, and the

multiple inappropriate comments about her breasts.  *Id.* at 110-11.

Harrison was "very alarmed by what [Saunders] was telling him.  He wanted

immediately to take it to higher management and get it handled through higher

management."  *Id.* at 109.  However, Saunders asked Harrison not to take her

complaint to higher management because she feared potential retaliation and/or an

ineffective response from the next manager in the chain of command, salaried

assistant manager Stephanie Bradley, who allegedly maintained a friendship with

Pollock outside of work.[8]  *Id.* at 93-94, 109-10, 276.  Harrison honored Saunders' request to not escalate the complaint, but he reassigned her to work in the produce department "to create distance" between her and Pollock.  *Id.* at 107-08.

Pollock's inappropriate behavior did not abate after Saunders began working in the produce department.  Although Saunders' reassignment helped her avoid Pollock to a degree, she was still required to help unload pallets with Pollock on truck days.  *Id.* at 112.  Pollock continued his practice of scooting behind Saunders on these days and made additional inappropriate comments, including: again asking if Saunders' cup size had gone up, *id.* at 116-18; telling her (once) that she "really can fill out a pair of jeans," *id.* at 134-35; joking to her (once) that she "better not ever tell anybody about me messing with you," *id.* at 136, 143; hugging her from behind (once) and whispering "stay calm. Just remember what would Jesus do?" when she was frustrated, *id.* at 136; and announcing to a group (once) that pork chops look like vaginas before standing behind Saunders (close enough that she could feel his stomach on her back) and whispering in her ear: "I bet yours looks like that," *id.* at 130-32.[9]

---

[8]  Both Saunders and Riveras testified that Pollock made it known at work that he was "fishing buddies" with Bradley's husband and that Pollock was assisting Bradley and her husband in purchasing a new boat.  Doc. 92-1 at 158; Doc. 92-7 at 126.  However, Bradley denied that she had a personal relationship with Pollock.  Doc. 92-37 at 2.

[9]  Saunders testified that the second inquiry into her cup size and the admonishment not to tell anybody he was "messing with her" happened after she made her initial complaint to Harrison, but she could not remember whether the other comments in this paragraph happened before or

Somewhere around late August, Pollock smacked Saunders on the buttocks while she was climbing a ladder in the freezer. *Id.* at 133, 145-47.[10] Distraught, Saunders immediately reported the continued inappropriate behavior to Harrison, telling him that she was at her "limit" and that she "wanted him to handle the situation." *Id.* at 145.

Harrison escalated the complaint up the chain of command at the DeFuniak Springs Walmart. About three days after Saunders' second complaint to Harrison, he raised the issue with Bradley who, according to Saunders' retelling of Harrison's update to her, dismissed Saunders' complaints as likely untrue. *Id.* at 147-48.

Then, about a week after Saunders' second complaint, Harrison arranged a meeting between Saunders and the store's salaried Asset Protection Manager, Gerald Huckabee. *Id.* at 119, 149, 275. Saunders told Huckabee "everything" related to Pollock's conduct. Doc. *Id.* at 154-55. Huckabee informed her that she needed to

---

after her initial complaint. But given her testimony that the inappropriate comments continued after she was reassigned to produce, Doc. 92-1 at 280; the fact that she specifically identified certain other comments as pre-dating her report to Harrison; the fact that she did not list these comments as examples she gave to Harrison during their initial conversation, *id.* at 110-11; and the fact that the Court must read the facts in the light most favorable to the EEOC on Walmart's motion for summary judgment, the Court can reasonably infer that these comments occurred after Saunders' initial complaint to Harrison.

[10] In the Charge of Discrimination she filed with the EEOC, Saunders stated that Pollock said "You are frustrating and you need a good spanking[,] [y]ou are the sassy one," Doc. 92-1 at 375. She described the context differently in her deposition, testifying that she was stepping up off of the ladder to reach a higher shelf, Pollock said "You're crazy for doing that," and then he smacked her on the buttocks when she got both feet back on the ladder. *Id.* at 133.

submit a written statement and that he would contact the Global Ethics Office to begin an investigation. *Id.* at 154-56.

Huckabee assured Saunders that Bradley would not find out about their meeting. *Id.* at 155-56. But she did.

Saunders did not immediately submit a written statement because she was leery of potential retaliation since Bradley learned of the meeting despite Huckabee's assurances of confidentiality. *Id.* at 156. Huckabee did not immediately contact the Global Ethics Office because he chose to first report the complaint to the store manager, Chris Wilcox, to respect the "chain of command," Doc. 92-3 at 139, but there is no evidence that Wilcox pursued the investigation any further at that point.

About a week after Saunders' first meeting with Huckabee, she met with him a second time to explain why she had not yet submitted her written complaint. Doc. 92-1 at 161-64. Courtney Huffstutler, a salaried Market Human Resources Manager, also attended this second meeting with Huckabee. *Id.* at 161. Huffstutler and Huckabee encouraged Saunders to submit a written statement at the second meeting, but Huffstutler assured Saunders that a Global Ethics Office investigation of the alleged harassment would proceed with or without her written statement. *Id.* at 163-64.

On September 27, a week or so after her meeting with Huffstutler and Huckabee, Saunders finally signed and dated a written statement, which she submitted to Huckabee on October 1. *Id.* at 73-75, 166; Doc. 86-5.  Huffstutler opened a case file with the Global Ethics Office that same day.  Doc. 92-18.

<u>C.     Saunders is Terminated</u>

Saunders was sporadically missing work around the same time that Pollock was harassing her.

At the time, Walmart had an attendance policy that allowed associates like Saunders who had been working for the company for less than six months to accrue 4 attendance "occurrences" before they were "subject to termination." Doc. 92-28 at 2.  Employees who had been with Walmart for longer than six months could accrue up to 9 occurrences in a rolling six-month period.  *Id*.

Coming into a scheduled shift late or leaving early counted as .5 occurrences. *Id.* at 3.  Missing a scheduled shift counted as 1 occurrence if the associate called into Walmart to report the absence and 4 occurrences if the associate did not call in (i.e., a "no call").  *Id*.

Saunders was absent on June 9, 2018, (one occurrence), absent on July 3 (one occurrence), and no-called on July 12 (four occurrences), putting her in violation of the attendance policy for new associates (with a total of six occurrences) by July 12. Doc. 92-30.  Bradley discussed the absences with Saunders, and because Saunders

explained that the absences were related to health issues (both her father's and her own), Bradley recommended that she reach out to Walmart's third-party leave-of-absence processor, Sedgwick, to request a medical accommodation for the absences. Doc. 84-4 at 4 (¶15); Doc. 92-1 at 63-64; Doc. 92-2 at 106.  If Sedgwick approved Saunders' request, then all of her medical-related occurrences would be forgiven. Doc. 92-2 at 106.

Saunders did not reach out to Sedgwick because she was concerned that they would want to speak with her ill father and put further stress on his health.  Doc. 92-1 at 64.

Saunders missed work again on August 11 (one occurrence) and arrived late on September 19 (.5 occurrence).  Doc. 92-30.  Bradley decided to terminate Saunders on September 19 based on her total of 7.5 occurrences and her continued failure to reach out to Sedgwick for an accommodation.  Doc. 84-4 at 4 (¶16).

Because Saunders had complained of sexual harassment by that point, Bradley reached out to Huffstutler to confirm that Walmart could terminate Saunders while her harassment complaint was pending.  *Id.* at 4 (¶17).  Huffstutler explained that harassment complaints do not excuse violations of the attendance policy and that Bradley could move forward with the termination.  *Id.*

Bradley finalized Saunders' termination on October 1, 2018, the same day that Saunders submitted her written harassment complaint to Huckabee.  *Id.* at 4-5 (¶18).

Bradley instructed Tammy Newby, a different assistant manager who had never met Saunders, to deliver the news of Saunders' termination. *Id.*; Doc. 92-1 at 71. After Newby informed Saunders that she was terminated, Saunders also met with Huckabee and Bradley, where Bradley explained that Saunders was being terminated for excessive absences. Doc. 92-1 at 72-74, 76-77.

Saunders would have been employed with Walmart for six months starting on October 21—twenty days after she was terminated. *Id.* at 277. Had she reached the six-month mark, her occurrence allowance would have moved from 4 to 9, meaning that she no longer would have been subject to termination under the attendance policy. *Id.*

## D.   Riveras' Interactions with Pollock

Riveras worked as a Fresh Cap Associate at the DeFuniak Springs Walmart, and she was transferred to the meat department to work with Saunders and Pollock in September 2018. Doc. 92-7 at 20, 22-23. She noticed Pollock's inappropriate behavior towards Saunders and eventually began experiencing it herself. *Id.* at 73-74.

Pollock "scooted" past Riveras "five or six times," often doing it when Riveras was bent over stocking shelves. *Id.* at 76. As Pollock scooted past, he would put his hands on her waist, and "[h]is belly and his private parts" would touch her

body.  *Id.* at 80-81.  Riveras "could feel [Pollock's] junk," but he did not "grind" his private parts into her as he passed.  *Id.*

Riveras would also occasionally catch Pollock "smiling and watching [Riveras] and [Saunders] work." Doc. 92-20.

On one occasion, Riveras noticed Pollock watching her as she bent over and commenting "I guess I'm gonna have to be extra nice to my wife when I get home" because of "the way your bent over there." Doc. 92-20.  On another occasion, the non-salaried meat department manager, Rob Haubensack, witnessed Pollock grab Riveras by the hips and scoot past her while she was bent over, but he did nothing to address the situation.  *Id.*; Doc. 92-7 at 76.

Riveras later confronted Haubensack, asking why nobody had done anything about Pollock and stating that she was considering filing a complaint with management.  Doc. 92-7 at 77.  Harrison, who overheard that conversation, warned Riveras that she would probably be fired if she complained about Pollock because Bradley was friends with him.  *Id.* at 77, 101-02.  On another occasion, Harrison told Riveras that Pollock "was just an old pervert" and that she should "brush it off."  *Id.* at 83.

Riveras and Saunders frequently discussed Pollock's behavior, weighing the costs and benefits of complaining to management.  *Id.* at 57.

14

Riveras complained about harassment verbally to Huckabee around the same time that Saunders first approached Huckabee,[11] and she submitted a written complaint to Huckabee on November 12, 2018.  Doc. 92-20.

### E.      Villalobos' Interactions with Pollock

Villalobos started working as a Fresh Cap Associate at the DeFuniak Springs Walmart in July 2018 in the frozen department, which was near the meat department where Saunders, Riveras, and Pollock worked.  Doc. 92-4 at 24, 64.  Villalobos did not have any negative interactions with or perceptions of Pollock until the day that Saunders was fired, at which point Villalobos overheard that Pollock had been harassing Saunders.  *Id.* at 83-84.

Approximately 30 days later, on October 30, 2018,[12] Villalobos had her own uncomfortable interaction with Pollock.  While Villalobos was stocking a freezer on the sales floor with the open freezer door to her left, Pollock approached from her right side and put his arm around her waist and pulled her to him, so that the two

---

[11]   Riveras testified that the two met with Huckabee together, Doc. 92-7 at 57-58, but Saunders did not identify Riveras as attending either of her meetings with Huckabee.

[12]  At one point, Villalobos testified that her interaction with Pollock occurred "a couple of days after [Saunders] got fired" Doc. 92-4 at 74, but she later testified that it occurred on October 30, almost a month after Saunders was terminated, *id.* at 91.  Villalobos' contemporaneous journal entries place the incident on October 30, Doc. 92-24 at 6, as does her November 1, 2018, written complaint to Huckabee, Doc. 92-23.

were standing side-by-side with their bodies touching.[13]  *Id.* at 98.  Villalobos pulled

away from Pollock's grasp, turning to face him with the freezer door to her back,

and Pollock then engaged her in one-sided conversation for about five minutes.  *Id.*

at 99-100.

The incident left Villalobos "in shock."  *Id.* at 99, 101.  She filed a written

complaint of harassment with Huckabee two days later, Doc. 92-23, and requested

a transfer to a department that would put her further away from Pollock during the

workday.  Doc. 92-4 at 111-12.  To honor that request, Villalobos was reassigned to

work across the store in the paper and chemicals department on November 2.  *Id.* at

112-13.

During her first few hours working in the paper and chemicals department,

Pollock approached her and asked whether she had been reassigned from the frozen

department.  *Id.* at 115.  Villalobos replied "no," and Pollock walked off.  *Id*.

Based on that second interaction and another instance that day where

Villalobos thought Pollock was attempting to approach her (but did not), Villalobos

called her husband to complain that Walmart was not addressing her allegations of

sexual harassment and that Pollock was "look[ing] for [her]" at work.  *Id.* at 124-25;

---

[13]   In its briefing, the EEOC characterized this interaction as Pollock "trap[ping] her from
behind," but a close review of Villalobos' deposition testimony does not support that description.
*See* Doc. 92-4 at 98 ("Q. And so [Pollock] came up onto your right side? A. Correct. … Q. So you
were standing should to shoulder with him? A. Shoulder to shoulder, yes.")

Doc. 92-24 at 6.  At that point, it had only been about 24 hours since Villalobos had submitted her complaint to Huckabee.  Doc. 92-4 at 128.

That same day, November 2, Villalobos' husband came to the DeFuniak Springs Walmart and accosted Huckabee and Bradley for their perceived inaction on Villalobos' complaint.  *Id*.; Doc. 92-24 at 6.  Bradley described Villalobos' husband's demeanor as angry and intimidating.  Doc. 92-2 at 141-42.

Villalobos' husband later called Huffstutler multiple times to follow up on Villalobos' complaint, and he returned to the store on November 9 to speak with Wilcox and others about the investigation.  Doc. 92-4 at 212; Doc. 92-24 at 6; Doc. 92-25 at 5.

Other than Pollock asking Villalobos if she would like to buy a book from his wife on November 7, 2018, the two had no further interactions.  Doc. 92-4 at 142-43; Doc. 92-24 at 6.

F.     Walmart's Investigation and Termination of Pollock

As mentioned above, the Global Ethics Office first opened a file regarding the complaints against Pollock on October 1, 2018, based on Saunders' complaint. Villalobos' and Riveras' complaints were eventually consolidated into the same Global Ethics Office "ticket" as Saunders' complaint.  Doc. 92-18 at 2.

Walmart did not interview any witnesses in connection with the investigation until November 1 when Villalobos and her manager were interviewed.  Doc. 92-8 at

252.  Walmart attributes some of the delay in investigation to Hurricane Michael, which made landfall near Mexico Beach, Florida on October 10, but there is conflicting evidence on the impact of the hurricane on the operations at the DeFuniak Springs Walmart.

Pollock was interviewed on November 10, at which point his employment was suspended pending the outcome of the investigation.  Doc. 92-19.  Pollock was terminated for "gross misconduct" five days later, on November 15, 2018.  Doc. 92-18 at 2.

## II.   Procedural History

Saunders filed a charge of discrimination with the EEOC in March 2019, alleging that she had suffered sexual harassment and that she had been retaliated against for reporting the harassment.  Doc. 86-8.  After an investigation, the EEOC determined that there was reasonable cause to support Saunders' claims.  Doc. 86-11.  The EEOC attempted to resolve the case with Walmart through the conciliation process, but those efforts stalled out by December 2020.  Doc. 86-12.

In September 2021, the EEOC filed a complaint in this Court on behalf of Saunders and "a class of female [Walmart] employees."  Doc. 1.  The complaint alleged a Title VII sexual harassment claim based on Pollock's behavior (Count I) and a Title VII retaliation claim based on Saunders' termination (Count II).  Count I

pertained to both Saunders and the "class" of female employees, whereas Count II was exclusive to Saunders.

In February of 2023, the EEOC filed an amended complaint that reasserted the same counts and identified Riveras and Villalobos as the members of the class. Doc. 59.  Walmart answered the amended complaint, denying the claims of harassment and retaliation and asserting numerous affirmative defenses.  Doc. 69.

The parties engaged in an extended period of discovery after which Walmart filed a motion for summary judgment on both counts in the amended complaint, and the EEOC filed a motion for partial summary judgment on eight of Walmart's nineteen affirmative defenses.  The motions are fully briefed and are ripe for rulings. No hearing is needed to rule on the motions.

## III.   Analysis

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "material" if it would change the outcome of the litigation, and a dispute about a material fact is "genuine" if the evidence is such that it could lead a reasonable factfinder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court's role at the summary judgment stage is not to weigh the evidence, but rather to "conclude whether [the evidence] is so one-sided that the result of any trial is

inevitable." *Turner v. Phillips*, 2022 WL 458238, at *4 (11th Cir. Feb. 15, 2022); *see also Anderson*, 477 U.S. at 252 (explaining that when ruling on a motion for summary judgment, "the judge must ask himself … whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented").

"The [summary judgment] standard set out in Rule 56 applies 'with equal force to claims of employment discrimination' as to any other type of claim." *Lewis v. Sch. Bd. of Palm Beach Cnty.*, 850 F. App'x 674, 677 (11th Cir. 2021) (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920 (11th Cir. 2018)).[14]

When reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). Accordingly, the Court views the evidence most favorably to the EEOC when considering Walmart's motion, and the Court views the evidence most favorably to Walmart when considering the EEOC's motion.

### A.   Walmart's Motion

Walmart argues that it is entitled to judgment as a matter of law on both counts asserted in the amended complaint. Each count will be discussed in turn.

---

[14]  The EEOC cites *Batey v. Stone*, 24 F.3d 1330, 1336 (11th Cir. 1994), for the proposition that summary judgment is "especially questionable" in employment discrimination cases given their fact-intensive nature, but the Eleventh Circuit has explained (albeit in an unpublished opinion) that the language in *Batey* was abrogated by a later *en banc* opinion. *See Lewis*, 850 F. App'x at 677 n.2 (citing *Chapman v. AI Transp.*, 229 F.3d 1012 (11th Cir. 2000) (en banc)).

*1.      Sexual Harassment (Count I)*

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex."  42 U.S.C. §2000e-2.  The statue "is not limited to economic or tangible discrimination"; it also prohibits "hostile work environments" that are "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up); *see also Walton v. Johnson & Johnson Servs. Inc.,* 347 F.3d 1272, 1279 (11th Cir. 2003) ("[I]ntangible forms of discrimination, such as being forced to work in a sexually hostile work environment, constitute actionable discrimination under Title VII").

The sexual harassment claim in Count I of the amended complaint is based on a "hostile work environment" theory.  To establish such a claim, the EEOC must prove that (1) the employee on whose behalf the claim was brought belongs to a protected group, (2) the harassment was unwelcome, (3) the harassment was sex-based, (4) the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment" and (5) there is a basis for holding the employer liable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Here, it is undisputed that the first two elements are met because the Aggrieved Employees belong to a protected group (women) and Pollock's behavior towards them was unwelcome.  However, Walmart argues that the EEOC cannot

meet the other three elements—i.e., that the harassment was sex-based, that the harassment was severe and pervasive, and that there is a basis to hold Walmart liable—with respect to any of the Aggrieved Employees.  Each of the disputed elements will be addressed in turn, after the Court addresses the EEOC's threshold argument that Pollock's actions towards all of the Aggrieved Employees must be analyzed collectively, rather than on an individual basis.

a.      *Collective vs. Individual Analysis*

The EEOC argues that the Aggrieved Employees' experiences cannot be considered apart from one another when evaluating whether the sexual harassment claim in Count I withstands summary judgment.  The Court agrees that all of the harassment—no matter who was the target—is relevant to each employee's claim to some degree.  However, that does not mean that an Aggrieved Employee who would not have a viable claim on her own may piggyback off the harassment suffered by the other women and proceed on a collective patchwork of the worst harassment suffered by each woman because the EEOC is seeking victim-specific compensation on behalf of the Aggrieved Employees and it can only bring suit "to the same extent as [the] individuals aggrieved."  *EEOC v. D.H. Holmes Co., Ltd.*, 556 F.2d 787, 794 (5th Cir. 1977)[15] (emphasis added), *overturned on other grounds by Gen. Tel. Co. of*

---

[15]   Decisions issued by the former Fifth Circuit prior to October 1, 1981, are binding precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

*the Northwest, Inc. v. EEOC*, 446 U.S. 318 (1980); *accord EEOC v. Waffle House, Inc.*, 534 U.S. 279, 305 (2002) (Thomas, J., dissenting) ("To the extent that the EEOC is seeking victim-specific relief in court for a particular employee, it is able to obtain no more relief for that employee than the employee could recover for himself by bringing his own lawsuit.").  Thus, if an Aggrieved Employee would not be entitled to relief on her own, she will not be entitled to relief merely because the EEOC chose to lump her claims in with other employees who were also harassed by Pollock.  Accordingly, in terms of who is eligible for relief, the claims must be considered individually.

That said, the more egregious harassment that Saunders suffered is still relevant to the viability of Riveras' and Villalobos' claims, to an extent.  Hostile work environment claims are subject to a totality of the circumstances test for which the whole may be greater than the sum of its parts—*i.e.*, "courts should examine the conduct in context, not as isolated acts."  *See Mendoza*, 195 F.3d at 1246.  Moreover, "[a] plaintiff may have a viable hostile environment claim even if the [abusive behavior was] not directed at her," *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995), so long as the plaintiff was aware of that abusive behavior at the time, *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014).  Thus, the fact that Saunders was being harassed by Pollock may make the workplace more hostile to Riveras and Villalobos to some degree, given that they

are also women who also interacted with and, to a lesser extent, were harassed by Pollock.  However, as a matter of common sense, there is not a one-to-one probative comparison between being harassed yourself and hearing through the grapevine that someone else is being harassed—the former is obviously more severe than the latter.

Accordingly, for the reasons stated above, each Aggrieved Employee must have an independently viable claim to survive summary judgment, but in assessing each claim independently, the Court will consider the impact that harassment of other employees had on the overall work-environment.

### b.    Sex-Based

To establish that harassment was sex-based, the EEOC "must show that but for the fact of [their] sex, [the Aggrieved Employees] would not have been the object of harassment." *Mendoza*, 195 F.3d at 1248 n. 5 (cleaned up).  In determining whether the harassment was based on sex, the Court is "guided by the 'common-sense rule that the context of offending words or conduct is essential to the Title VII analysis.'" *Tonkyro v. Sec'y, Dep't of Veteran's Affairs*, 995 F.3d 828, 838 (11th Cir. 2021) (quoting *Reeves*, 594 F.3d at 810).

Not all behavior "tinged with offensive sexual connotations" constitutes discrimination because of sex, with distinctions often turning on the context. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).  For example, "a frustrated sales representative … shout[ing] 'Son-of-a-bitch! They lost that truck'"

has no sex-based undertones, while "a co-worker call[ing] a female employee a 'bitch'" does. *Reeves*, 594 F.3d at 810. Accordingly, the Court must consider the full "constellation of surrounding circumstances, expectations, and relationships" through the lens of "common sense and an appropriate sensitivity to social context" to determine whether Pollock's harassment was sex-based. *Oncale*, 523 U.S. at 82.

"Courts and juries have found the inference of [sex-based] discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id*. at 80. And, here, a jury could easily draw that same inference—that Pollock's behavior toward the Aggrieved Employees was driven by his sexual attraction to them (or women generally) since it was not directed towards men.

For example, Pollock expressly told Saunders that he was attracted to big breasts (uniquely female anatomy) and that she "fit the description." This statement overtly indicates sexual attraction to women generally and sexual attraction to Saunders specifically. Pollock also told Riveras that he would have to be "extra nice to his wife later" because of the way she was bent over—a statement with undertones of sexual desire. And, Pollock smacked Saunders on the buttocks, which is typically perceived as a sexual advance. This sexually charged conduct also colors the

remainder of Pollock's interactions with the Aggrieved Employees, even those that are less overtly sexual, because otherwise sexually innocuous behavior (unnecessary touching, the "scooting," staring, speaking closely, lingering) becomes less innocuous once someone has made it known that they desire you sexually.  *See Mendoza*, 195 F.3d at 1248 (reasoning that "'following and staring' can betray romantic or sexual attraction" or it can be "a natural and unavoidable occurrence," depending on the context).

On the latter point, the Court did not overlook Walmart's argument that Pollock's "scooting" was born of necessity in navigating the compact freezer, not sexual desire.  However, a jury could find otherwise for three reasons.

*First*, a jury could find based on Saunders' and Riveras' testimony that Pollock would stand behind them for longer than necessary, coupled with his other sexually charged interactions with them, that the "scooting" was an opportunistic effort to put his body close to women he sexually desired rather than a means to get where he was going.  That is especially true given that the scooting put Pollock's groin close to the women's buttocks.[16]

---

[16]  Walmart takes issue with the EEOC's characterization of the scooting as "Pollock … rub[ing] his genitals against Saunders," pointing out that Saunders never used the terms "penis, genitals, crotch, or privates" in her testimony.  *See* Doc. 100 at 4 & n. 1.  However, it is true as a matter of common sense (and human anatomy) that when a man scoots behind a woman close enough to press against her body, his genital area will likely be in contact with the back of her body at some point.  Moreover, Riveras testified that she saw Pollock "brush … [h]is private area and his belly" against Saunders while scooting.  Doc. 97-7 at 68.

*Second*, Saunders testified that she never saw Pollock scoot past a male coworker in this fashion, Doc. 92-1 at 258, even though at least one other man helped them in the freezer on truck days, Doc. 92-7 at 44.   That is "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace," from which a jury could find that Pollock treated women differently than men.  *Oncale*, 523 U.S. at 80-81.

*Third*, the fact that Pollock did not scoot behind men (and that he did not even scoot behind Saunders until she had been working with him for over a month) undermines the notion that the scooting was physically necessary to traverse the freezer.

The Court also did not overlook the cases Defendant cites for the proposition that even remarks about female sexual anatomy are not always sex based.  *See* Doc. 85 at 27 (citing *Tonkyro*, 995 F.3d at 838; *McMillian*, 634 F. App'x 274, 276 (11th Cir. 2015); and *Howard v. City of Robertsdale*, 168 F. App'x 883, 889-90 (11th Cir. 2006)).  But those cases are distinguishable because there was either no indication of sexual attraction between the harasser and the same-sex employee (*Tonkyro*; *McMillian*), they involved non-specific, untargeted comments on female anatomy (*Tonkyro*), or the court was not analyzing the "based on sex" element in the first place (*Howard*).  By contrast, here, Pollock's comments at least implicitly suggested

his sexual desire for Saunders and Riveras, and many of his comments specifically referred to their female anatomy.

Accordingly, there is evidence from which a jury could find that Pollock's alleged harassment of Saunders and Riveras was sex-based.[17]

### c.    Severe or Pervasive

For sexual harassment to rise to the level of an actionable hostile work environment claim, "the harassment [must be] sufficiently severe or pervasive to alter the terms and conditions of employment." *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). The test "contains both an objective and a subjective component," requiring both "that a reasonable person would find [the environment] hostile or abusive" and "that the victim subjectively perceives [it] to be abusive." *Id.* at 1276 (cleaned up) (quoting *Harris*, 510 U.S. at 21-22).

Here, there is evidence from which a jury could find that the subjective component was met for each of the Aggrieved Employees. For example, Saunders testified that enduring the harassment was so stressful that it exacerbated her heart problems, Doc. 92-1 at 268-69; Riveras testified that the harassment caused her anxiety and sowed a distrust of men, Doc. 92-7 at 160-61; and Villalobos testified

---

[17] It is questionable whether Villalobos' lone interaction with Pollock was sex based, given that it was far less sexual in nature than Saunders' and Riveras' interactions. Regardless, the Court need not analyze this element of Villalobos' claim in detail because she cannot meet the "severe or pervasive" element, as explained below.

that she no longer felt comfortable working at Walmart after the harassment, Doc. 92-4 at 173.

However, only Saunders' claim can survive summary judgement on the objective component. "In evaluating the objective severity of the harassment, [courts] consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276.

Pollock's conduct towards Riveras and Villalobos was infrequent—Riveras suffered a single comment and "a few" scooting incidents and Villalobos suffered a single arm-around-the-waist-from-the-side incident. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"); *Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872, 874 (11th 2013) (holding that a single instance of unwanted touching on shoulder was not severe or pervasive).

With respect to Riveras, although Pollock's comment to her had sexual implications and was inappropriate, it did not amount to an overt sexual proposition, making it less severe. Moreover, the severity of Pollock's scooting behind Riveras was lessened by the lack of other inappropriate conduct directed towards her.

With respect to Villalobos, although her single encounter was technically "physical," being briefly pressed against someone's body shoulder-to-shoulder, without any sexual suggestion or innuendo, can hardly be called severe, threatening, or humiliating.  *See Arafat*, 549 F. App'x at 874 ("Such fleeting contact, unaccompanied by sexual suggestiveness or aggression is insufficient [to satisfy the objective prong].") Moreover, after the lone touching incident, Villalobos' subsequent interactions with Pollock were minimal and not inappropriate.

By contrast, Saunders endured far more egregious harassment than the other two women.  Her harassment spanned four months—over half the time she worked at Walmart—and consisted of: over a dozen sexually charged comments, most of which were about her buttocks, breasts, or vagina, and some of which were delivered up close as Pollock whispered in her ear; leering, including directly at her nipples on one occasion; arguably unnecessary scooting every truck day; and a physical smack on the buttocks.  *See Olson v. Lowe's Home Cntrs., Inc.*, 130 F. App'x 380, 388 (11th Cir. 2005) (finding severe or pervasive element met where "over a span of 2½ months, [the harasser] subjected [plaintiff] several times a week to offensive sexual comments, and touched her at least three times").  All the while, Saunders knew that Pollock allegedly had a personal relationship with someone with termination authority over her, and he once "joked" that she better not tell anyone.

A jury could also find that Pollock's harassment adversely impacted Saunders' work performance in multiple ways. She had to reorganize her work schedule solely to "create distance" from Pollock, moving almost completely from the meat department to produce and asking for shift changes. She also had two tachycardic episodes that caused her to miss work during this period, which she attributes to harassment-induced stress. *See Harris*, 510 U.S. at 22 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being ….").

Thus, as to Saunders, a jury could reasonably find that Pollock subjected her to objectively severe or pervasive harassment.

The cases cited by Walmart do not undermine that conclusion. *See* Doc. 85 at 30-35 (citing *Mendoza*, 195 F.3d 1238; *Mitchell v. Pope*, 189 F. App'x 911 (11th Cir. 2006); *Dar Dar v. Ass'd Outdoor Club, Inc.*, 248 F. App'x 81 (11th Cir. 2007); *Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862 (11th Cir. 2009); *Tonkyro*, 995 F.3d 828; and *Ricks v. Indyne, Inc.*, 2022 WL 8022536, at *1 (11th Cir. Oct. 14, 2022)). None of those cases involved the same frequency of the conduct presented here;[18] one involved same-sex interactions without sexual undertones (*Tonkyro*);

---

[18] For example, *Mitchell* involved 16 incidents over the course of <u>four years,</u> 189 F. App'x at 913, whereas this case involves at least that many incidents (between the comments, the scooting, and the touching) over the course of only <u>four months</u>. And, in *Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000), the court found 15 incidents over four months to be frequent.

three did not involve any interference with the plaintiff's work responsibilities (*Lockett*; *Mitchell; Mendoza*); and one involved a plaintiff who never reported the harassment to her supervisors (*Ricks*).

The Court also did not overlook Walmart's suggestion that Saunders asking Harrison not to escalate the issue to upper management when she initially reported it undermines the notion that the harassment was severe.  However, Saunders' testimony, taken in the light most favorable to the EEOC, would allow a jury to find that her concern with escalation was potential retaliation, not that the harassment was insignificant.  *See* Doc. 92-1 at 109-10, 276, 281-82.

Moreover, there is evidence from which a jury could find that Saunders had reason to believe that Bradley would not take seriously a complaint against Pollock and that Harrison did nothing to dissuade her of this notion.  Indeed, a jury could find from Harrison's statement to Riveras that she might be fired for complaining about Pollock that even Harrison might have believed that Bradley would retaliate against Saunders if she complained.[19]  Thus, Saunders' hesitance to escalate her harassment complaint does not necessarily undermine the severity of the harassment.

---

[19]   The Court did not overlook Walmart's argument that Riveras' retelling of Harrison's statement cannot be considered on summary judgment, because Harrison is now deceased and his statement cannot be reduced to admissible evidence.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment [only] if the statement could be reduced to admissible evidence at trial or reduced to admissible form." (cleaned up)).  However, Harrison's statement appears to fall within the hearsay exemption in Fed. R. Evid. 801(d)(2)(D) for statements "made by [a] party's agent or employee on a matter within the scope of that relationship and while it existed" because

Accordingly, for the reasons stated above, a reasonable jury could find that the EEOC has satisfied the severe or pervasive element with respect to Saunders, but not Riveras or Villalobos.

### d.   Basis to Hold Walmart Liable

"[A]n employer's liability for [sexual] harassment may depend on the status of the harasser.  If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).  Thus, "[w]hen a plaintiff alleges that her employer is liable for the harassing conduct of co-workers instead of supervisors"— as is the case here—"the employer will be held liable only if it 'knew or should have known of the harassing conduct but failed to take prompt remedial action.'" *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007) (quoting *Miller*, 277 F.3d at 1278).

Walmart argues that the earliest point at which it could be deemed to have notice of Pollock's behavior towards his co-workers was Saunders' first report to Huckabee (late August or early September)[20] and that Walmart took prompt

---

Walmart's Open Door Policy provides that part of Harrison's job as a low-level supervisor was receiving associate complaints, addressing them when he could, and escalating them when appropriate.  Thus, Harrison's comment about whether Riveras should escalate her complaint was "on a matter within the scope of" his employment relationship with Walmart.

[20]  There is a factual dispute regarding the date of Saunders' first report to Huckabee, with Bradley identifying the date as September 20, 2018, Doc. 92-2 at 236, and Saunders identifying the date as "late August, early September," Doc. 92-1 at 275.  On Walmart's motion for summary

remedial action after that point.  The EEOC responds that there is evidence from which a jury could find that Walmart was on notice after Saunders' first report to Harrison (late July to early August) and that Walmart's response, which did not result in any action until November, was not "prompt."  The Court agrees with the EEOC.

### i.     Notice

"When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003); *see also Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999) ("[By promulgating a reporting policy, the employer] itself [has] answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures.").  However, when an employer has an anti-discrimination policy that is "comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress" and the employee does not report harassment in accordance with that policy, the employer is "insulated

---

judgment, the Court resolves all factual disputes in favor of the EEOC and adopts Saunders' earlier timeframe. *See Pennington*, 261 F.3d at 1265.

from liability … premised on constructive knowledge of the harassment." *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 15543 (11th Cir. 1997).

To "properly report sexual harassment" pursuant to an employer's procedures, (1) the employee must "complain[] to the appropriate person" identified in the policy to receive complaints and (2) the contents of the complaint "must be sufficient to put [the employer] on notice of the sexual harassment." *See Olson*, 130 F. App'x at 389-390.[21]

Here, it is undisputed that Saunders' initial complaint to Harrison was sufficiently detailed to apprise him of the harassment.  However, Walmart argues that it did not have actual notice of the harassment based on that complaint because Saunders did not complain to the appropriate person.

More specifically, Walmart argues that employees can only report harassment under the Harassment Policy, not the Open Door Policy, and because the Harassment

---

[21] *Olson*, along with many of the other cases the parties cite with respect to the basis-for-liability element, involve what is known as the *Faragher-Ellerth* affirmative defense, not the basis-for-liability element of a *prima facie* case.  A defendant can only invoke the *Faragher-Ellerth* defense when the alleged harasser is a supervisor, rather than a co-worker, and the defense applies if (1) the employer exercised reasonable care to avoid and correct the harassment and (2) the employee unreasonably failed to take advantage of preventative or corrective measures the employer offers. *See Banks v. City of Atlanta, Ga.*, 2022 WL 4587869, *1 (11th Cir. Sept., 30, 2022) (noting the distinction between the *Faragher-Ellerth* defense for supervisor harassment and the basis-for-liability element for co-worker harassment); *Beckford v. Dep't of Corrections*, 605 F.3d 951, 961 (11th Cir. 2010) ("When … employees complain of harassment by someone other than a supervisor, the *Faragher*[-*Ellerth*] defense does not apply.").  Although the two legal contexts are distinct, the *Faragher-Ellerth* cases are still instructive here to the extent they discuss (1) when an employer can be deemed to have notice of work-place harassment and (2) when an employer's response to reported harassment is sufficient.

Policy identifies only salaried managers and the Global Ethics Office as eligible to receive complaints, Harrison (a non-salaried supervisor) was not an "appropriate person" to receive harassment complaints. The Court disagrees because Walmart's complaint reporting policies contemplate that its employees may validly report harassment through either the Harassment Policy or the Open Door Policy.

The Open Door Policy states that it can be used to discuss "all matters related to the company," that "[a]nything related to Walmart is a fair subject to raise in an open door communication," and that Walmart "will investigate any complaints or concerns you raise [through the open door process] promptly and thoroughly." Doc. 92-16 at 1-2 (emphasis added). Moreover, the "Open Door Communications Management Guidelines"—a guidebook instructing managers and supervisors on how to administer the Open Door Policy—requires supervisors to escalate Open Door complaints that implicate the Harassment Policy, which at least implies that associates may report harassment to their immediate supervisors (and have their complaints escalated for them), rather than directly to salaried management. Doc. 92-17 at 2.

Likewise, the "Discrimination and Harassment Prevention" Q & A section of Walmart's "Global Statement of Ethics" instructs associates who receive unwanted comments on their attractiveness to either report the issue "through the Open Door Process" or to "contact Global Ethics." Doc. 92-1 at 330. And, the alternative nature

of the Open Door Policy and the Harassment Policy is underscored by Huckabee's deposition testimony. *See* Doc. 92-4 at 46 ("Q. Is the expectation that hourly managers if they receive complaints would then report it up to the next level above them who was [a] salary manager … ? A. Yes"); *id.* at 85 ("Q. Okay. So if a person went to their direct command instead of Global Ethics first, that's still a valid complaint? A. Correct.").

Additionally, although the Harassment Policy is more context-specific to sexual harassment than the Open Door Policy, it is phrased in suggestive rather than a mandatory terms—*i.e.*, "if you experience, observe or become aware of any conduct that may violate this policy, you <u>should</u> immediately report the violation to any salaried member of management or … to the Global Ethics Office" (emphasis added). The Eleventh Circuit has held that employers are not insulated from notice when an employee fails to follow "should" language in a policy. *See Breda v. Wolf Camera & Video*, 222 F. 3d 886, 890 n. 4 (11th Cir. 2000).

The Court did not overlook Walmart's citations to *Banks*[22] and *Madray*,[23] but neither of those cases undermine the conclusion that Walmart could be placed on notice of harassment through either policy. Walmart cites *Banks* for the proposition that an employee reporting harassment must "take full advantage of the employer's

---

[22] *Banks v. City of Atlanta, Ga.*, 2022 WL 4587869, *1-2 (11th Cir. Sept., 30, 2022).

[23] *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1302 (11th Cir. 2000).

preventative measures [for harassment]," 2022 WL 4587869, at *2 (cleaned up), but that is a requirement for the *Faragher-Ellerth* affirmative defense, which is inapplicable to this case.  And *Madray*, which was also dealing with the *Faragher-Ellerth* defense, did not foreclose the possibility for an employer to be put on notice through an open door policy, even where the employer has a separate, more specific sexual harassment policy.  *See Madray*, 208 F.3d at 1301-02.[24]

In sum, because Walmart's complaint reporting policies allow employees to report harassment through either the Open Door Policy or the Harassment Policy, it follows that Walmart had actual notice of Saunders' complaint when she made her initial report to Harrison in late July or early August of 2018.  *See Olson*, 130 F. App'x 390 n. 19 (explaining that where an employer's policy provides multiple avenues for reporting harassment, any of the persons identified by any of those avenues is an "appropriate person" to receive harassment complaints); *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2nd Cir. 1998) (rejecting argument that "the plaintiff has an affirmative duty to bring her allegations to the company's attention in more than one way" because once "a plaintiff reports harass[ment] in accordance

---

[24]  In *Madray*, it was undisputed that the plaintiff failed to comply with the employer's sexual harassment policy, but the plaintiff argued that it had still provided the employer notice through the separate open-door policy.  *See* 208 F.3d at 1301-02.  The Eleventh Circuit rejected that argument, not because notice can never be provided through an open-door policy, but because the plaintiff had not complied with the open-door policy in that case.  *Id.* at 1302.  Here, by contrast, Walmart does not argue that Saunders failed to comply with the Open Door Policy.

with company policy, she is under no duty to report it a second time before the company is charged with knowledge of it").

### ii.     Prompt Response

"[T]he question of whether an employer timely acted to correct harassment turns on when it had proper notice of an employee's harassment complaint." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1315 (11th Cir. 2001).  Here, if the jury finds that Walmart had notice of Saunders' compliant as early as late July 2018, it could easily find that Walmart's response was anything but prompt.  Indeed, apart from Harrison's ultimately ineffective effort to move Saunders to the produce department, a jury could find that Walmart did essentially nothing to investigate or address Saunders' complaint until it started interviewing witnesses in November 2018. *See Baldwin*, 480 F.3d at 1303 ("A <u>threshold step</u> to correcting harassment is to determine if any occurred, and that requires an investigation that is reasonable given the circumstances." (emphasis added)).

The Court did not overlook Walmart's argument that its failure to act promptly was caused by business disruption in the wake of Hurricane Michael.  However, putting aside the conflicting evidence on the impact of the hurricane on the operations at the DeFuniak Springs Walmart, a jury could easily reject that argument because the hurricane did not make landfall in North Florida until mid-October 2018, long after Saunders first reported the harassment to Huckabee in late August or early

September and even longer after she first reported it to Harrison in late July or early August.

Nor did the Court overlook Walmart's argument that it could not have been expected to act following the report to Harrison because Saunders requested that Harrison not escalate the issue to upper management. However, the Court finds that argument unpersuasive because a reasonable jury could find that (1) Harrison should have complied with the requirement in Walmart's Open Door Communications Guidelines to escalate the harassment complaint, regardless of Saunders' request, and (2) the gravity of the complaint compelled Harrison to escalate it.

With respect to the first point, the Open Door Communications Guidelines—which Harrison was bound by as a supervisor—<u>required</u> him to escalate complaints of sexual harassment for further investigation and make no exception for complainants who request a different remedy. *See* Doc. 92-17 at 2; *cf. Baldwin*, 480 F.3d 1306 ("[T]he [sexual harassment] complainant does not get to choose the remedy.") Moreover, from Saunders' perspective, a jury could find that she did all she needed to do to under the Open Door Policy by raising the issue with Harrison, regardless of what he then did with that information. *See Breda*, 222 F.3d at 890 ("[E]mployees … who believe they are victims of harassment need not be concerned with whether they pursued their complaints far enough up the company ladder. The

sole inquiry … is whether the complaining employee followed the procedures established in the company's policy.").

With respect to the second point, although it is undisputed that Saunders requested Harrison not escalate the issue, a jury could find that the context and contents of her complaint were serious enough to compel Harrison (and by extension, Walmart) to act, irrespective of Saunders' hesitancy. Indeed, a jury could find that Saunders' complaint put Harrison (and, thus, Walmart) on notice that "[Pollock] posed a risk of creating a sexually hostile environment to [Saunders]," which is a scenario that the Eleventh Circuit has explained might compel an employer to act, even if the reporting employee has requested that the issue be kept quiet. *See Nurse "BE" v. Columbia Palms West Hosp. Ltd. P'ship*, 490 F.3d 1302, 1310 n. 13 (11th Cir. 2007) (discussing the holding in *Malik v. Carrier Corp.*, 202 F.3d 97, 106 (2d Cir. 2000), that "[p]rudent employers will compel harassing employees to cease all such conduct and will not, even at a victim's request, tolerate inappropriate conduct that may, if not halted immediately, create a hostile environment.").[25]

---

[25] The Court did not overlook Walmart's citation to *Olson*, which stated in dicta that "[i]f [a plaintiff] did not want [the harasser's] comments reported or acted upon, then [the employer] would not have been placed on proper notice of the harassment." 130 F. App'x at 391 n. 21. But *Nurse "BE"* contrasted the reasoning in *Olson* with reasoning from out-of-circuit cases that require an employer to act upon a harassment complaint irrespective of the subjective wishes of the employee, which suggests that *Olson* is limited to circumstances where the complaint is ambiguous and not circumstances where (as here) the contents of the complaint are "explicitly sexual." 490 F.3d at 1310 n. 13.

Finally, the Court did not overlook Walmart's argument that Pollock stopped harassing Saunders after she made her complaint.  However, putting aside the fact that there is no evidence that Walmart actually did anything to confront Pollock, that argument is refuted by Saunders' testimony that the scooting and comments continued even after her meetings with Huckabee, Doc. 92-1 at 280, and that Pollock's behavior never improved until the day she was fired, *id.* at 268.

Accordingly, because there is evidence from which a jury could find that Walmart did not take prompt action after receiving notice of Pollock's inappropriate conduct towards Saunders,[26] there is a basis to hold Walmart liable for that conduct.

\*     \*     \*

In sum, for the reasons stated above, the Court finds that there is evidence from which a jury could find that Saunders (but not Riveras or Villalobos) was subjected to an actionable sexually hostile work environment based on Pollock's conduct towards her.  Accordingly, Walmart's motion for summary judgment on Count I of the amended complaint is due to be denied with respect to Saunders' sexual harassment claim and granted with Riveras' and Villalobos' claims.

---

[26]  A jury could come to the same conclusion with respect to Riveras if it accepted her testimony that she complained to Huckabee around the same time as Saunders claims to have had her first meeting with him (i.e., late August or early September) because Walmart did not do anything to investigate the claims against Pollock until November 1.  By contrast, the undisputed evidence establishes that Walmart promptly acted on Villalobos' complaint because Pollock was suspended just over a week after she submitted her written complaint with Huckabee and he was fired five days later.

### 2.   Retaliation (Count II)

Walmart argues that summary judgment should be granted on Saunders' retaliation claim because Walmart proffered a legitimate reason for her termination (violations of the attendance policy) and there is no evidence from which a jury could find that the reason was pretextual.  The Court agrees.

"Title VII prohibits an employer from retaliating against 'any employee because she has opposed any practice made an unlawful employment practice' by Title VII, 'or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.'" *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (alterations adopted) (quoting 42 U.S.C. §2000e-3(a)).  To succeed on its retaliation claim, the EEOC must prove that Saunders' sexual harassment complaint was the "but-for cause" of her termination.  *Id.* at 1135 (quoting *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 362 (2013)).

To establish a *prima facie* case of retaliation, EEOC must show that (1) Saunders engaged in a protected activity, (2) she suffered a materially adverse employment action, and (3) there is a causal connection between the two.  *Id.* at 1134.  "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware of the protected conduct, and that the protected activity

and the adverse actions were not wholly unrelated." *Patterson v. Georgia Pac.*, LLC, 38 F.4th 1336, 1351 (11th Cir. 2022) (cleaned up).

If the EEOC establishes a *prima facie* case, retaliatory intent is presumed and the burden of production shifts to Walmart to "articulat[e] a legitimate, non-discriminatory reason for the employment action." *Gogel*, 967 F.3d at 1135. If Walmart produces a legitimate justification for the employment action, the presumption is rebutted, and the burden shifts back to the EEOC to "demonstrate that the proffered reason was merely a pretext to mask retaliatory actions." *Id.* (cleaned up).

To establish pretext, the EEOC "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" *Id.* at 1136 (cleaned up). The EEOC "must meet [the defendant's] proffered reason head on and rebut it," and "a reason is not pretext for retaliation unless it is shown <u>both</u> that the reason was false, <u>and</u> that retaliation was the real reason." *Id.* (cleaned up) (emphasis in original).

The EEOC has established a *prima facie* case. Although Walmart disputes that Bradley knew of Saunders' complaint at the time that she decided to terminate Saunders, a jury could find that Bradley would have had knowledge under the

timeline that Saunders testified to.[27]  And, the temporal proximity between Bradley

learning of Saunders' complaint and deciding to terminate her (a few weeks at most),

combined with Harrison's warning to Riveras that employees who complain get

terminated, is enough for a jury to draw a causal connection between the two.  *See*

*Patterson*, 38 F.4th at 1352 ("The general rule is that close temporal proximity

between the employee's protected conduct and the adverse action is sufficient

circumstantial evidence to create a genuine issue of material fact of a causal

connection" (cleaned up)).

That said, the EEOC cannot rebut the non-retaliatory reason proffered by

Walmart for Saunders' termination—her 7.5 occurrences in violation of Walmart's

attendance policy.  It is undisputed that Saunders was well above her four allowed

occurrences at the time she was terminated, and it is also undisputed that Saunders

never reached out to Sedgwick, as Bradley recommended, to have some or all of her

absences excused.  Indeed, Saunders testified that she understood she was subject to

termination under the attendance policy at the time.  Doc. 92-1 at 88.

---

[27]  Bradley testified that she made the decision to terminate Saunders on the morning of September 19, 2018, and that she only learned of Saunders' sexual harassment complaint later that day, after the decision was made.  Doc. 84-4 at 4 (¶16).  However, Saunders testified that Harrison told Bradley of her complaint a few days before her first meeting with Huckabee, which according to Saunders, happened sometime in late August or early September.  Doc. 92-1 at 275.  Thus, under Saunders' timeline, Bradley would have known of her complaint before she made the termination decision on September 19.

Although the EEOC attempts to identify other individuals who were not terminated for similar violations of the attendance policy,[28] two of those individuals (Kaitlin Owen and Vanetra Reese) were not treated differently than Saunders because they were terminated for their violations of the attendance policy. *See* Doc. 84-4 at 4-5 (¶18); Doc. 92-33. The other alleged comparator (Dylan Carrol) was not "similarly situated in all material respects" to Saunders because he had almost all of his absences approved by a supervisor, bringing his occurrence count below the acceptable threshold. *See* Doc. 84-4 at 7 (¶24), 33.

The Court did not overlook the EEOC's argument that the fact Saunders exceeded the occurrence threshold in July but was not terminated until October (after she complained) raises the specter of pretext. But Walmart proffered a legitimate explanation for the delay: *i.e.*, when Saunders first surpassed the threshold in July, Bradley gave her some grace to reach out to Sedgwick, but when Saunders continued to accrue occurrences and did not reach out to Sedgwick, Bradley decided to terminate her. Saunders does not dispute that she never contacted Sedgwick, and the EEOC does nothing else to cast doubt on Walmart's explanation for delaying the termination decision.

---

[28] *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325-26 (11th Cir. 2020) ("In a Title VII retaliation case, a plaintiff can attempt to establish … pretext … by showing that the employer treated similarly situated employees differently," but the plaintiff must "show[] that [she] and [her] comparators are similarly situated in all material respects.").

Nor did the Court overlook the EEOC's argument that Walmart's shifting explanation of Saunders' termination is evidence of pretext.  *See Hurlbert v. St. Mary's Health Cary Sys., Inc.,* 439 F.3d 1286, 1298 (11th Cir. 2006) ("[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext.").  More specifically, the EEOC argues that (1) Bradley testified that termination for violation of the attendance policy was mandatory, while other evidence shows it was discretionary, (2) Bradley deviated from ordinary practice in having a different assistance manager deliver the news of Saunders' termination, and (3) Walmart has periodically changed who it claims to be the decisionmaker for the termination.  However, the Court finds each of those arguments unpersuasive.

*First*, regardless of whether termination under the attendance policy was mandatory or discretionary, what matters is that Bradley was actually empowered to terminate Saunders under the policy and that retaliation was not the but-for reason for her termination.  *See Forsyth v. Univ. of Ala., Bd. of Trustees*, 2021 WL 4075728, *5 (11th Cir. Sept. 8, 2021) ("[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for an unlawful reason" (cleaned up)).

*Second*, while having an assistant manager whom Saunders had never met deliver the news of her termination appears to be inconsistent with Walmart's

standard practice, it is undisputed that Bradley also spoke to Saunders on the day of her termination. Thus, that sleight deviation from standard practice does not "meet … head on and rebut" Walmart's explanation that Saunders was terminated for violating the attendance policy.

*Third*, there is no evidentiary support for the argument that Walmart has changed its position on who made the decision to terminate Saunders. The EEOC cites Walmart's position statements (Docs. 92-22, 92-37) from the agency proceedings as proof that "[d]uring the investigation, [Walmart] denied Bradley's involvement in Saunders' termination, instead attempting to frame her termination as a routine process conducted by personnel coordinator Teresa Torres." However, the only role that the position statements attribute to Torres is printing reports, not making termination decisions, and the statements do not "den[y] Bradley's involvement in Saunders' termination" as the EEOC claims.

In sum, because there is no evidence from which a jury could find that the legitimate, non-retaliatory reason proffered by Walmart for Saunders' termination was pretextual, Walmart is entitled to summary judgment on the retaliation claim in Count II of the amended complaint.

## B.    EEOC's Motion

The EEOC argues that eight of Walmart's affirmative defenses (one, four, five, seven, nine, twelve, eighteen, and nineteen) fail as a matter of law. Walmart

withdrew two of the defenses (seven and twelve) in its response to the EEOC's motion, but it argues that the other six challenged defenses can survive summary judgment.  For the most part, the Court agrees with the EEOC.

### 1.    *Affirmative Defenses One, Four, and Five*

Walmart's affirmative defenses one, four, and five all relate to alleged procedural deficiencies in the EEOC's investigation at the agency level.  In its response to the EEOC's motion, Walmart clarified that these defenses only relate to any potential claim of harassment the EEOC might make against Wilcox, but the EEOC represented in its reply that has not and will not assert such a claim in this case.  Thus, affirmative defenses one, four, and five have no relation to this case and summary judgment is due to be granted on these defenses.

### 2.    *Affirmative Defenses Nine and Nineteen*

Walmart's ninth and nineteenth affirmative defenses assert that any damage Saunders suffered was effectively self-inflicted because she failed to comply with Walmart's corporate policies.  *See* Doc. 69 at 12 (¶9) ("Plaintiff's claims on behalf of Saunders … are barred to the extent that Saunders … could have avoided any damages by complying with Defendants' workplace polices"); *id.* at 14 (¶19) ("Plaintiff's claims for relief on behalf of Saunders … are barred or reduced by Saunders' … own conduct.").  To the extent that these defenses are referring to Saunders' termination being caused by her violation of the attendance policy, rather

than retaliation, that point is moot given the Court's disposition of the retaliation claim. And, to the extent that Walmart seeks to use these defenses to argue that Saunders' initial use of the Open Door Policy, rather than the Harassment Policy, is legally fatal to her claim, the Court has rejected that argument as a matter of law because, as discussed above, Walmart's complaint reporting policies allow harassment to be reported under either policy. However, to the extent that Walmart contends that Saunders' actions (*i.e.*, asking Harrison not to escalate it, delaying submission of a written statement, etc.) frustrated Walmart's ability to provide prompt remedial action, the defenses remain viable because any delays attributable to Saunders' actions may impact her damages—which is an issue for the jury to decide. Thus, summary judgment is due to be granted in part and denied in part on affirmative defenses nine and nineteen.

### 3.    *Affirmative Defense Eighteen*

Walmart's eighteenth affirmative defense alleges that Pollock was acting outside the scope of his employment while harassing Saunders, and according to Walmart, this defense "speaks specifically to whether [Pollock's] behavior was within the scope of employment as would be necessary to establish vicarious liability." Doc. 91 at 17-18. However, as the EEOC argues, the defense has no bearing on this case because an employer can only be held liable for co-worker harassment (as opposed to supervisor harassment) on a direct, negligence theory, not

vicarious liability.  *See Vance*, 570 U.S. at 424; *Miller*, 277 F.3d at 1278; *see also Beckford*, 605 F.3d at 958 (explaining that when a harassment claim is against someone other than a supervisor "liability is direct rather than derivative, [so] it makes no difference whether the [harasser] is an employee, an independent contractor or for that matter a customer.  Ability to 'control' the actor plays no role." (internal quotation marks omitted) (quoting *Dunn v. Wash. Cnty., Hosp.*, 439 F.3d 689, 691 (7th Cir. 2005))).  Accordingly, because Walmart's liability for Pollock's harassment of Saunders does not depend on whether he was acting within the scope of his employment, summary judgment is due to be granted on affirmative defense eighteen.

## IV.   Conclusion

In sum, for the reasons explained above, it is **ORDERED** that:

1.    Walmart's motion for summary judgment (Doc. 85) is:

a.    **GRANTED in part** with respect to Count I of the amended complaint, and the sexual harassment claim brought on behalf of the "class" of female employees that includes Riveras and Villalobos is **DISMISSED with prejudice**;

b.    **GRANTED** with respect to Count II of the amended complaint, and the retaliation claim brought on behalf of Saunders is **DISMISSED with prejudice**; and

     c.     **DENIED** in all other respects.

2.     The EEOC's motion for partial summary judgment (Doc. 87) is:

     a.     **GRANTED** with respect to Walmart's affirmative defenses one, four, five, seven, twelve, and eighteen; and

     b.     **GRANTED in part** and **DENIED in part** with respect to Walmart's affirmative defenses nine and nineteen.

3.     Within 7 days from the date of this Order, the parties shall confer and advise the Court of several mutually agreeable dates and times during the following two weeks for a telephonic case management conference to schedule what remains of this case for trial.

**DONE and ORDERED** this 17th day of July, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**